Henry Lee WARREN, Plaintiff-Appellant Cross-Appellee,

v.

The RESERVE FUND, INC., Reserve Management Corporation, Harry B.R. Brown and Bruce R. Bent, Defendants-Appellees Cross-Appellants.

No. 82–1697.

United States Court of Appeals, Fifth Circuit.

April 2, 1984.

Rehearing and Rehearing En Banc Denied May 17, 1984.

Steven A. Sinkin, San Antonio, Tex., Susman & McGowan, Terrell W. Oxford, James Thomas McCartt, Houston, Tex., Herbert B. Newberg, Philadelphia, Pa., for plaintiff-appellant cross-appellee.

Salmanson, Smith & Mouer, Thomas M. Booker, Robert O. Smith, Austin, Tex., Grutman & Schafrann, Vito C. Casoni, Donn A. Randall, New York City, for Reserve Fund.

Oppenheimer, Rosenberg, Kelleher & Wheatley, Seagal V. Wheatley, Edward M. Lavin, San Antonio, Tex., for Reserve Mngt., Brown & Bent.

Before BROWN, REAVLEY and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Plaintiff Henry Lee Warren, an investor in The Reserve Fund, Inc., a mutual fund headquartered in New York City, appeals from the district court's denial of class certification and its order of dismissal in an action alleging securities misrepresentation by the mutual fund. In his complaint, Warren claimed that prerecorded WATS line

telephone messages that stated the Fund's "current yield" misrepresented the Fund's actual daily dividend to investors. The relief sought is based on § 10(b) of the Securities Exchange Act of 1934. We affirm both the denial of certification and the order of dismissal.

## I. FACTS

On June 26, 1979, plaintiff Henry Lee Warren consulted his broker about investing some cash that plaintiff had received from the sale of stock. The broker suggested investing in The Reserve Fund, Inc., a no-load open-end mutual fund,[1] and gave Warren a WATS number to call for more information about the fund's performance.

Each day, the Reserve Fund prepared a recorded message based on the following format:

> The Reserve Fund's current yield on _____ is _____%. We paid _____% for the last _____ days. We earned _____% for the last quarter. Our assets exceed $_____ and our average portfolio life is _____ days. For further information, please call (212) 977–9880 or write us at 811 Seventh Avenue, N.Y., N.Y. 10019. Thank you for calling.

On June 26, the Fund reported on the WATS message that the "current yield" was 9.88%. Mr. Warren invested $7,827.79 with the Fund that same day.[2]

On October 22, 1979, Warren instituted this action against The Reserve Fund[3] un-der Rule 10b–5, 17 C.F.R. § 240.10–5 (1980), promulgated by the Securities and Exchange Commission under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976).[4] Warren's sole claim is based on one line from the Fund's pre-recorded WATS line telephone message. Warren contends that the first sentence of the message, which reported the Fund's "current yield," constituted a scheme to defraud the investing public since the figure quoted as the "current yield" was not the *actual rate* that funds placed with defendant earned on that date[5] and since a reasonable investor would assume that "current yield" represented actual dividends paid. Warren claims that the Fund either should have included the true daily yield in the recording or alternatively, that the Fund should not have stated the "current yield" at all, since stated alone this information misled the public.[6]

On October 29, 1979, Warren moved for class certification on behalf of all persons, numbering approximately 80,000, who purchased shares of The Reserve Fund during the three year period from October, 1976 through October, 1979. The Fund made a motion for summary judgment claiming that plaintiff suffered no out-of-pocket damages and therefore had no compensable loss. The summary judgment motion was denied without an opinion by Judge Roberts on August 18, 1980. The case was then reassigned to Judge Bunton who denied

---

1. "No-load" means that no fee or service charge is assessed for the purchase or sale of shares. The term "open-end" means that the Fund continuously sells and redeems shares at net asset value.

2. The parties presented conflicting evidence with regard to whether Mr. Warren actually called the WATS number *before* he invested in the Fund on June 26, 1979.

3. Also named as defendants in this suit were The Reserve Management Corporation, manager of the Fund; Henry B.R. Brown, chairman of the Fund; and Bruce R. Bent, president of the Fund.

4. There was also a claim based on Texas law. It was dismissed and the dismissal was not appealed.

5. On June 26, 1979, The Reserve Fund paid an actual dividend of 7.9114%. The WATS message stated that the "current yield" on June 26 was 9.88%.

6. Plaintiff originally moved for injunctive relief but withdrew this motion on the eve of the scheduled hearing upon realization that the Fund no longer quoted current yield in its WATS message. In fact, the Fund ceased quoting current yield on October 15, 1979, in response to an industry-wide recommendation that a new format be used for yield quotations. The new format required quotes of seven day historical figures in place of quotes reflecting one day's interest. Since the Fund altered the allegedly misleading message, plaintiff only seeks monetary relief in this action.

Warren's motion for class certification.[7] The case was then transferred again to Judge Garcia who dismissed the case on November 9, 1982 after reconsideration of the damages issue.

Six months after filing the action, in April, 1980, Warren redeemed his investment and received $8,571.00, representing a gain of $743.21 and a yield of 12.15%.

## II. DISMISSAL

### A. *District court ruling*

■ Plaintiff's sole claim is founded on an alleged violation of Rule 10b–5. In order to state a claim for relief under 10b–5, the plaintiff must establish (1) a misrepresentation or omission or other fraudulent device; (2) a purchase or sale of securities in connection with the fraudulent device; (3) scienter by defendant in making the misrepresentation or omission; (4) materiality of the misrepresentation or omission; (5) justifiable reliance on the fraudulent device by plaintiff (or due diligence against it); and (6) damages resulting from the fraudulent device. *Cameron v. Outdoor Resorts of America, Inc.,* 608 F.2d 187, 193 (5th Cir.1979), *affirmed in part, vacated and remanded in part on rehearing,* 611 F.2d 105 (5th Cir.1980); *see also Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir.1981), *cert. granted,* 456 U.S. 914, 102 S.Ct. 1766, 72 L.Ed.2d 173 (1982), *aff'd in relevant part,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Plaintiff can succeed in stating a claim only if a genuine issue of material fact is established with respect to *each* of these elements.

The district court dismissed the case based on its conclusion that plaintiff had not made a threshold showing of out-of-pocket loss, which the Court considered to be the proper measure of damages in a 10b–5 action. The district court noted that plaintiff purchased stock in the Fund with an original investment of $7,827.79. He sold the shares in April, 1980, for $8,571.00, earning a dividend of greater than 12%. Since plaintiff recovered his investment and gained an additional $743.21, the court found no compensable loss.

Plaintiff contends that the district court erred in concluding that he did not suffer out-of-pocket loss,[8] and that in any event out-of-pocket loss is not the only measure of injury in a 10b–5 action.[9] We find it unnecessary to analyze the legal effect of any damages that may have resulted in this case. Whether or not plaintiff suffered damages compensable under Rule 10b–5, the dismissal of this action was not an abuse of discretion because plaintiff could not establish the presence of scienter, another necessary prerequisite to recovery under Rule 10b–5. For this reason, we decline consideration of the various damages theories presented by plaintiffs in their briefs, and focus instead upon scienter.[10]

---

**7.** Judge Bunton certified an interlocutory appeal for the denial, but this Court denied leave for the interlocutory appeal.

**8.** With respect to traditional out-of-pocket loss, plaintiff bases his loss on the fact that the Fund paid a smaller dividend than represented, considering the price paid for the shares. Plaintiff contends that if an investor paid $1.00 for a share based on representations that the Fund was paying an annualized current yield of 15% (.04% a day) and if the *actual* dividends paid that day were only .035% due to capital losses, the investor *lost* .005%. Plaintiff claims that .005% was lost *even if* the Fund redeemed the investor's share for the purchase price, $1.00 the next day. That is, the plaintiff argues, the Fund was only able to maintain a $1.00 redemption price *because* it paid a dividend less than it represented it could pay. If the investor had known that his daily yield

would only be .035 cents, the investment would have been attractive only at an initial investment of 85 cents per share as opposed to $1.00. According to plaintiff, the 15 cents differential represents actual out-of-pocket loss—the difference between what the investor paid ($1.00) and what he received (.85). Applying this theory to his particular facts, plaintiff claims a loss of $50—$200.

**9.** In addition to an out-of-pocket loss theory, plaintiff contends that it is also possible to base 10b–5 damages on either a benefit of the bargain, lost opportunities, or disgorgement of profits analysis.

**10.** Although Judge Garcia dismissed the case solely on his conclusion that plaintiffs had not established out-of-pocket loss, on appeal this Court may properly consider other reasons for

## B. *Scienter*

■ It is now well established that in order to state a cause of action under 10b–5, the plaintiff must allege and prove that the defendant acted with scienter. In the seminal case, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 193 n. 12, 96 S.Ct. at 1381 n. 12.

Since the *Ernst & Ernst* case, this Court has held that in the context of a private action for money damages under Rule 10b–5, scienter is satisfied by proof that defendants acted with severe recklessness.[11] *Broad v. Rockwell International Corporation,* 642 F.2d 929, 961 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). Our definition of scienter is precise. "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but *an extreme departure from the standards of ordinary care,* and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 961–62 (emphasis added).[12]

■ Plaintiff's basic contention is that he was confused by the current yield message because he thought current yield meant daily dividend. Scienter, however, cannot be established by a mere assertion of plaintiff's confused state of mind. On the contrary, analysis of scienter requires an examination of *defendant's* conduct.

■ In concluding that defendant's conduct did not rise to the level of scienter, we rely on several factors. First, the defendants introduced evidence indicating that the Fund's method of calculating and reporting yields fully complied with then existing SEC recommendations. At the district court hearing, the defendant referred to studies conducted by the SEC which were designed to determine what type financial information the funds should supply to the public.[13] In an effort to provide meaningful data that would enable potential investors to compare the various funds, the Commission proposed that money funds publish two types of yields—one reflecting present earning rate and a second reflecting the rate shareholders were paid in the past. The "present earning rate" represented what the assets in the fund were currently earning, net of fund expenses, and was to be valued by whatever method the fund consistently used. The Commission suggested that funds disclose past yields through use of average portfolio maturity quotas as well as some form of historical yields. These particular figures were chosen because they reflect both present and past performance and could aid investors in formulating an overall picture of various funds.

---

affirming the judgment of the district court. *California Bankers Association v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 1522, 39 L.Ed.2d 812 (1974).

**11.** This issue was specifically left open by *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

**12.** Other circuits have similarly limited the definition of scienter in 10b–5 cases. *See, e.g., Coleco Industries, Inc. v. Berman,* 567 F.2d 569, 574 (3d Cir.1977), *cert. denied,* 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978) *citing* 423 F.Supp. 275, 296 (E.D.Pa.1976), (" 'a conscious deception or . . . a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches' that which attaches to conscious deception' " . . .).

**13.** In making conclusions about the SEC studies, the defendant relied on a speech given to a Mutual Funds Investment Management Conference by Lewis J. Mendelson, assistant director of the SEC's Division of Investment Management Regulation in 1976. In this speech, Mr. Mendelson explained the conclusions the Commission had drawn from their studies of money market funds. The SEC conducted the research as a result of the explosive growth experienced by money market funds in the early 1970s. In the three years following 1972, when the Reserve Fund first instituted the money market concept, the number of money market funds increased to 33, representing investments of more than 3.69 billion dollars.

The Reserve Fund followed these recommendations in composing their prerecorded WATS message. The Fund presented the "present earning rate" as "current yield." As suggested by the SEC, this figure represented what the Fund's assets were earning, net of operating expenses.[14] In addition to a current yield quotation, the Fund also provided information reflecting its performance in the past. The WATS message included historical yield quotations for the past seven days, the past thirty days, and the past ninety days. These figures represented the Fund's *actual* dividend distribution for those periods of time.[15]

Although this string of financial quotations may have confused Mr. Warren, there is not a scintilla of evidence that the Fund intentionally misled him or even that the Fund departed from the standard of ordinary care in formulating the WATS message. On the contrary, the defendant submitted affidavit testimony by a recognized expert on money market fund operations that the Fund "consistently used the most accurate methods available within the Money Fund Industry in calculating and reporting their yields, and have repeatedly used due diligence in disclosing the method of the calculations . . ."[16]

Mr. Warren contends that the Fund had an affirmative duty to explain the meaning of current yield or to distinguish current yield from actual dividends earned. We disagree. No representative from the Fund ever told Mr. Warren that current yield meant actual dividends. The message did not state or suggest that current yield represented actual dividends. In fact, the word "dividend" was never used in the recorded message.

Further, even if an investor was confused by the recorded message, he could call an additional number provided by the Fund for an explanation. This additional number was included in the WATS message. Although the plaintiff never called the number, several other investors called seeking a variety of information, including information regarding the current yield calculation. The Reserve Fund trained their employees to respond to shareholder's telephone inquiries.

We also place significance on the fact that the Fund did not change the format of the message to represent the best picture at all times. Rather, the Fund used the same format for six years, regardless of whether interest rates were falling or rising. Thus, while on some days the current yield quote exceeded the actual dividends paid, on other days actual dividends paid were higher than the current yield figure quoted on the WATS message.

Finally, the plaintiff has not presented any motive which would lead the Fund to misrepresent the earnings. The Fund is a no-load fund. No fee or service charge is assessed for the sale of its shares and thus no commissions are earned on the sale of its shares. The Fund neither retained nor gained any benefit at the expense of its shareholders. The shareholders, including Mr. Warren, received every penny earned by the Fund.

14. Current yield is calculated as:

$$\frac{I\,(36,500)}{V}$$

"I" represents the *net interest income* actually earned by the Fund's portfolio since the previous day, less expenses incurred in buying, selling and managing its business. "V" represents the Fund's *net asset value* as of the close of business of the New York Stock Exchange on the preceding day, or the total dollar value of its outstanding shares. The number 36,500 is used to generate an annualized yield.

15. "Current yield" did not include capital adjustments resulting from fluctuations in interest rates because inclusion of such nonrecurring factors in the daily quote would severely distort the yield reporting when annualized. The historical yields, however, did include unrealized appreciation and depreciation. Inclusion of appreciation and depreciation in historical quotations is more appropriate than in daily yield quotations because the fluctuations are smoothed in the averaging process and tend to project a more typical yield.

16. Mr. William E. Donaghue, Registered Financial Adviser with the Securities and Exchange Commission; publisher of "Donaghue's Money Fund Report," a review of money market funds for investors.

Considering all the above factors and basing our decision on the rigid standards established by the Supreme Court and this Court, we conclude that the facts fall far short of establishing scienter. Since plaintiff did not establish a claim for relief under Rule 10b–5, the district court properly dismissed the case.

## III. DENIAL OF CLASS CERTIFICATION

The plaintiff also appeals the district court's denial of class certification in this case. Although our conclusion that the district court properly dismissed the case itself vitiates any need to review the class certification question, we briefly note our affirmance on that issue, as well.

In order to prevail on a motion for class certification, the movant has the burden of proving *each* of four prerequisites set forth in Fed.R.Civ.P. 23(a), and in addition, at least one of the factors included in sub-section (b) of Rule 23. *Horton v. Goose Creek Independent School District,* 690 F.2d 470, 483 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983).

The four requirements of Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

[5] The trial court found, *inter alia,* that the case should not be certified for class action because plaintiff Warren was not a suitable class representative. In making this decision, the court relied on Rule 23(a)(3), which requires typicality with respect to the named representative's claims and/or defenses and the claims and/or defenses of the entire class. The court expressed concern that Warren's claim was atypical of the class, due to the possibility of various defenses which might be available to the Fund against Warren. Evidence in the record indicated that Mr. Warren was a sophisticated investor in the financial market who worked daily with yields and calculations of yields on investment securities. In fact, Mr. Warren was a vice-president of a bank as well as a licensed securities broker. In a suit against the fund, Mr. Warren's financial sophistication might make him a weak representative since the Fund could argue that Warren did not exercise due diligence in relying on any reckless omissions or misrepresentations. While the availability or ultimate success of this defense in Warren's individual cause of action is not certain,[17] we have held in the past that the presence of this characteristic peculiar to the named plaintiff does present a sufficient question of typicality to justify a district court's decision to deny class certification. *Garonzik v. Shearson Hayden Stone, Inc.,* 574 F.2d 1220, 1221 (5th Cir. 1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 39 (1979). The rationale behind this hesitance is a concern that representation of the class will suffer if the named plaintiff is preoccupied with a defense which is applicable only to himself. *J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 999 (7th Cir. 1980).

"The decision to grant or deny certification is initially committed to the sound discretion of the district judge and will not be overturned except for abuse of discretion." *Redditt v. Mississippi Extended Care Centers, Inc.,* 718 F.2d 1381, 1387 (5th Cir.1983). Abuse does not appear in this case. Since the trial court correctly concluded that plaintiff could not meet *each and every* prerequisite under Rule 23(a), we decline to interfere with its refusal to certify the class.

---

**17.** In *Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977), this Court held that due diligence by the plaintiff was established unless the investor "refused to investigate 'in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.'" 551 F.2d at 1020, *citing* W. Prosser, § 34 at 185 (1971).

## IV. ATTORNEY'S FEES

The Reserve Fund urges us to require appellant or his attorneys to pay appellee's attorney's fees based on Fed.R. Civ.P. 11 and 28 U.S.C. § 1927.[18] The grant or denial of attorney's fees, however, lies within the discretion of the district court and we will only reverse a district court's decision on a showing of abuse of discretion. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 716 (5th Cir.1974). Although the cost of this litigation is no doubt burdensome, we cannot hold on these facts that the conduct of the plaintiff or his attorneys reached that level of impropriety at which the district court's decision against awarding fees would constitute an abuse of discretion.

AFFIRMED.

---

**18.** Rule 11 gives the district court the authority to impose sanctions, including attorney's fees, against a party who submits pleadings without a reasonable belief that the arguments are supported by fact and law. Section 1927 similarly allows the district court to impose the burden of attorney's fees on an attorney who "unreasonably and vexatiously" complicates legal proceedings.