**Dr. Sampat SHIVANGI and Dr. Udaya S. Shivangi, Individually and on Behalf of Others Similarly Situated, Plaintiffs,**

v.

**DEAN WITTER REYNOLDS, INC., Thomas Aitken and James Y. Palmer, Defendants.**

**Civ. A. No. J82–0367(B).**

United States District Court, S.D. Mississippi, Jackson Division.

June 20, 1986.

Michael Farrell, Jackson, Miss., for plaintiffs.

Kenneth A. Rutherford, Jackson, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

BARBOUR, District Judge.

The Court, having rendered its bench opinion at the conclusion of Plaintiffs' case, dismissing Plaintiffs' case upon Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure Rule 41(b), now makes its written findings of facts and conclusions of law pursuant to Federal Rules of Civil Procedure Rule 52(a).

## FINDINGS OF FACT

Plaintiffs, Dr. and Mrs. Sampat Shivangi ("Shivangi"), two Jackson, Mississippi, doctors sued Defendants, Dean Witter Reynolds, Inc. ("Dean Witter"), Thomas Aitken ("Aitken"), and James Y. Palmer ("Palmer"), alleging violations of Rule 10b–5 of the Securities Exchange Commission as a result of Defendants' failure to disclose to Plaintiffs, prior to purchase, the "markup," or commission, which Defendants would receive on the sale of an over-the-counter stock in which Dean Witter was a "market maker".

Plaintiffs opened an investment account with Dean Witter in the spring of 1981. Aitken was their account executive. At the time, Palmer was a vice-president of Dean Witter in charge of Dean Witter's three Mississippi offices. Dr. Shivangi, a relatively new and inexperienced investor in the stock market, on the recommendation of Defendant Aitken, purchased for the account of himself and his wife through Dean Witter on the over-the-counter market 400 shares of Keldon Oil stock on May 13, 1981, for 17½ dollars per share or a total purchase price of $7,000. Although the value of Keldon Oil stock rose briefly after the purchase, its price soon began a steady decline. Plaintiffs sold their Keldon Oil stock on the open market in December 1981 at a loss.

As is customary in the trade, Dean Witter trades stock either on or off the national exchanges. When trading on a national exchange such as the New York or the American Exchange, Dean Witter generally acts as an agent, effectuating sales of stock between customers A and B. Where Dean Witter acts as an agent, it receives a commission on the transaction and the account executive receives a portion of that commission. Stocks which are not traded on a national exchange may be traded over-the-counter. In over-the-counter stocks, Dean Witter and others may "make" a market by offering to buy and sell the stocks at prices published on a national automated computer quotation system (NASDAQ) created by the National Association of Securities Dealers (NASD). Dean Witter and other market makers in the over-the-counter market generally buy and sell these stocks for their own accounts.

In 1981, Dean Witter was a "market maker" in certain stocks and had approximately 25 traders in its New York trading department and others in its San Francisco office. Each trader was assigned about 30 stocks to trade, and had use of Dean Witter's capital to invest. There were over 2700 stocks on the NASDAQ system in

1981 and Dean Witter made a market in approximately 1000 to 1200 stocks. All over-the-counter trades in which Dean Witter is a "market maker" are handled on a principal basis, meaning that Dean Witter sells the stock to its retail customer from its own account, whether or not in inventory, rather than acting as an agent of the customer, unless the customer requests that the transaction be handled on an agency basis. Dean Witter's Jackson office manager estimated that 75 to 80% of the over-the-counter trades in which Dean Witter makes a market are handled on a principal basis.

Dean Witter's compensation for agency trades is referred to as "commission." The "commission" on principal trades is referred to as "mark-up." Dean Witter's mark-up never exceeds the commission it would make if the trade were on an agency basis and its pricing policy generally results in a slight price savings to the customer when the transaction is handled on a principal basis as opposed to an agency basis since the mark-up on a principal trade is rounded down to the nearest $1/16$th below the commission which would be charged if the transaction was handled on an agency basis. Dean Witter buys and sells to its retail customers at the best market price available for the stock based upon the NASDAQ quotes without regard to the price paid by Dean Witter for the stock or Dean Witter's market quotes.

In addition to other methods, Dean Witter notifies its sales force of the stocks in which it is a market maker by periodically including those stocks on its "overnight offering list." At the close of each trading day, each trader is required to place on the overnight offering list either "bid" or "ask" quotes on five stocks in which Dean Witter makes a market. The price quotes must be good for at least 1000 shares and are firm offers until the opening of trading the following morning. Account executives around the country can review the list on their computer screens and call customers to solicit trades after market hours. In fact, Aitken called Dr. Shivangi at about 7:30 a.m. to encourage him to buy Keldon Oil.

The purchase price was reflected on the confirmation slip Plaintiffs received from Dean Witter shortly after the transaction. As required by Securities and Exchange Commission rules,[1] the confirmation slip indicated that Dean Witter acted as a principal in the transaction and that it was a "market maker" in the security. The confirmation slip did not indicate "mark-up" on the trade which Defendant received nor were Plaintiffs otherwise told of the "mark-up."

Disclosure of Defendants' compensation is material. If the trade had been an agency transaction in which Dean Witter was not a "market maker," the commission on the sale of 400 shares of Keldon Oil at $17\frac{1}{2}$ dollars per share would have been $154.70, of which the account executive would have kept 30 to 40% of his compensation ($46.41–$61.88). In this case, since Dean Witter was a "market maker" in Keldon Oil stock, Dean Witter gave a "sales credit" to its sales department on the transaction which included not only the "mark-up" but also the spread, yielding a total sales credit on the transaction of $1,000. Plaintiffs' account executive, Aitken, received 40% of the sales credit, or $400.00. The basis of the Plaintiffs' suit is that the difference between $46.41 and $400.00 received by the account executive created a conflict of interest in Dean Witter's compensation system which should have been disclosed to customers.[2]

1. It shall be unlawful for any broker or dealer to effect ... any transaction in ... any security ... unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification disclosing (1) whether he is acting as agent for such customer ... or as principal for his own account; and ... (5) if he is acting as principal for his own account ... (ii) in the case of a transaction in an equity security, whether he is a market maker in that security. Rule 10b–10(a), 17 C.F.R. § 240.10b–10(a) (1983).

2. Under the policies of Dean Witter, the sales credit on the sales of over-the-counter stocks includes only the mark-down and not the

Dr. Shivangi, at the time of the purchase, was not aware that Dean Witter was a "market maker" for Keldon Oil stock nor was he familiar with the term "market maker" although he also admitted that he never inquired about its meaning. Shavingi also stated that had he been told that Dean Witter was a "market maker" in Keldon Oil stock and that his account executive could earn 6 to 8 times more from this transaction as a result of Dean Witter's "market maker" status, he would not have purchased Keldon Oil stock even though the net price to him was no greater.

Plaintiffs bought approximately 6 stocks from Dean Witter during a several month period in 1981. Of these stocks, all but Keldon Oil increased in value. Keldon Oil was the only over-the-counter stock sold to the Plaintiffs in which Dean Witter made a market.

Aitken, Plaintiffs' account executive, recommended the stock to Plaintiffs based upon Dean Witter's trader's recommendation who knew the principals of Keldon Oil and had himself invested in the company. The stock did increase approximately 10% in the week following Plaintiffs' purchase although it steadily declined thereafter.

Jerry Mullins, executive vice-president for Dean Witter and manager of its over-the-counter trades, who also invested in Keldon Oil, explained that the sales credit for the over-the-counter market was created as a result of the "inside market rule" adopted by Securities Exchange Commission in 1980. The rule requires market makers in over-the-counter stocks to sell or buy at the inside market prices. The rule led to a decrease in the spread between the "bid" and "ask" prices for over-the-counter stocks. As a result, account executives realized less compensation for sales for over-the-counter stock. To offset the result of the inside market rule, Dean Witter adopted its present compensation plan of "sales credit" on over-the-counter stock. Mullins also testified that Keldon Oil stock

was atypical due to its 2 to 3 point spread which, in his opinion, indicated that the stock was inactive and possibly hard to sell. He stated that the typical point spread in 1981 was ¼ to ⅜. Mullins stated that the compensation system would be difficult to explain to retail customers.

Palmer, branch manager of Dean Witter's Jackson branch in 1981, testified that Keldon Oil stock was recommended to him by Dean Witter's analyst and that he was aware of the large "spread." Although he could not remember whether or not Keldon Oil stock was listed on the overnight offering list, he stated that he probably told the account executives of Keldon Oil stock and of the spread. He, too, invested in Keldon Oil stock in 1981 based upon the analyst's recommendation.

## CONCLUSIONS OF LAW

█ Plaintiffs' sole claim against Defendants is founded on an alleged violation of Rule 10b–5. In order to prove a violation of Rule 10b–5, Plaintiffs must establish: (1) a misrepresentation or omission or other fraudulent devise; (2) a purchase or sale of securities in connection with the fraudulent device; (3) scienter by defendants in making the misrepresentation or omission; (4) materiality of the representation or omission; (5) justifiable reliance on the fraudulent device by plaintiffs (or due diligence against it); and (6) damages resulting from the fraudulent device. *Warren v. Reserve Fund, Inc.,* 728 F.2d 741, 744 (5th Cir.1984). "Scienter" as defined by the United States Supreme Court in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), is "a mental state embracing intent to deceive, manipulate, or defraud." Since *Ernst & Ernst,* the Court of Appeals for the Fifth Circuit has held that scienter is satisfied by proof that defendants acted with severe recklessness. As stated in *Warren v. Reserve Fund, Inc.,* 728 F.2d at 745, the Fifth Circuit's "definition of scien-

---

spread. Therefore, an account executive gets about the same sales credit on both agency and over-the-counter principal trades when a cus-

tomer *sells* a stock. This case involves the purchase of a stock.

ter is precise. 'Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but *an extreme departure from the standards of ordinary care*, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.' " [Emphasis supplied]. To ascertain the existence of "scienter" required an examination of the defendant's conduct. *Id.*

In this case, the Court finds that Defendants' Motion to Dismiss pursuant to Rule 41(b) is well taken for the reason that Plaintiffs have failed to carry their burden of proving a prima facie case with regard to the issue of scienter. Although the Court considers Defendants' failure to disclose the compensation distinction between an agency and a principal transaction to Plaintiffs to be a material omission which would have affected Plaintiffs' decision to purchase Keldon Oil stock, Plaintiffs presented no evidence that the omission was made with any intent to deceive, manipulate or defraud Plaintiffs. In fact, the proof established that the compensation distinction between agency and principal transactions resulted from a distinct industry situation created by the adoption of the inside market rule by the Securities and Exchange Commission in 1980.

Defendants argue that disclosure of the compensation distinction is not material since, as a practical matter, the client pays the same commission regardless of whether the transaction is an agency transaction or a principal transaction. However, the amount of commission paid by the client does not make this fact immaterial. Obviously, Plaintiffs here relied upon this omission because they bought the stock. Obviously, it was to their detriment because the stock declined in value and they lost money. Plaintiffs stated that had they known of the compensation distinction between an agency and a principal transaction, they would not have bought the stock because of a potential conflict of interest. Because

of this potential conflict of interest, the Defendants' failure to disclose this information could be a material fact which would influence an investor's decision to invest. However, in this case, without the requisite proof of scienter, this Court can grant Plaintiffs no relief. Accordingly, Defendants' Motion to Dismiss is hereby granted and the Plaintiffs' Complaint is dismissed with prejudice.