**KAUFMAN & ENZER JOINT VENTURE**

v.

**Lansing Maxwell DEDMAN, et al.**

**Civ. A. No. 83–1881 (Section M).**

United States District Court, W.D. Louisiana, Monroe Division.

Oct. 28, 1987.

Hudson, Potts & Bernstein, James A. Rountree, Monroe, La., for plaintiffs.

Hansen & Anderson, John B. Maycock & Glen D. Watkins, Salt Lake City, Utah, Provosty, Sadler & deLaunay, LeDoux R. Provosty, Jr., H. Brenner Sadler, and F. Rae Swent, Alexandria, La., for McDonald C. Smith & G. Reed Petersen Cas. Co.

Shotwell, Brown & Sperry, George Wear, Jr. and Francis C. Broussard, Monroe, La., for Kaufman and Enzer Accountants Inc., Ben Kaufman, Mel Enzer, Mort Resnick, Sam Klein, Steve Morse and Henry Gold.

## OPINION

LITTLE, District Judge.

This hoary case came on for bench trial in August of 1987. The following constitutes this Court's findings of fact and conclusions of law.

The plaintiff is a partnership confected in accordance with California law. Its name is Kaufman & Enzer, a Joint Venture. K & E, a shorthand appellation for the partnership, was created in 1978 by professional and nonprofessional kindred spirits of the California certified public accounting known as Kaufman & Enzer, Certified Public Accountants, Inc. K & E's original partners are known as "old partners." When K & E enlarged its membership to include, by invitation, some of the clients of the accounting firm, the new partners became known, without much inventiveness, as "new partners." The enlargement of the partnership family occurred at the same time as, or was the reason for, the reduction to writing of the partnership agreement. The agreement, although signed in 1981, recites an effective date of 1978, the time when the oral agreement of partnership was adopted by the old partners.

The only defendant participating at the trial was McDonald Smith. Mr. Smith, a domiciliary of Utah, is a CPA and was employed by Kaufman & Enzer Accountants, Inc. (KEA) as a staff accountant. The relationship between Smith and KEA was without a blemish. In fact, Smith was to be made a partner in KEA, an elevation not experienced by any other individual in recent years. In other words, KEA was a tight organization and only after an extensive apprenticeship period would a staff associate be accorded the opportunity of becoming a partner and only then if all partners were convinced that the relationship would be professionally sound as well as emotionally harmonious.[1]

For reasons immaterial to this determination, Smith decided to return to his roots, departed California and opened an office in Salt Lake City, Utah. Although Smith and Sam Klein (a CPA with KEA) engaged in a social phone call on occasion, Smith's friendship with the professional employees of KEA was not renewed until he visited the California firm in October of 1981. At that time he conferred with various leaders of the accounting firm. As is usual when former associates rekindle acquaintance, the prodigal is always interrogated as to his current activities. Smith's fortunes had changed. He had shed the shackles of accounting. No more bean counting or Ebenezer Scrooge for him, Smith was in the oil and gas business. Smith was an officer and director of Challenge, Inc., a shareholder in Argosy Energy, Inc. and an officer, director and fifty percent shareholder in MtLand Energy Corporation. Virtually mesmerized by the euphoria emanating from their former associate, principals in KEA listened with rapt attention as Smith unraveled his mineral exploits. Smith told of a drilling project in which he had recently participated. Nine wells were drilled in Montana and seven were completed as producers. Smith was going to participate in another drilling project with the same operator in Louisiana. He offered to

---

1. The Court is not unmindful that KEA is a corporate entity and that corporations are owned by shareholders, not partners. But the witnesses described Smith's future position as that of a partner and this Court has preserved that nomenclature. This Court can only surmise that had Smith accepted the partnership offer that he would, in fact, have been a shareholder in a professional corporation. The distinction between a partner and a shareholder in a professional corporation is irrelevant to this decision.

let his friends participate in that mineral quest.

Smith described in positive terms Max Dedman and Bethlan Production Company, the operator involved in the upcoming project. The new project was to be drilled in Richland Parish, Louisiana and was to be known as the Bethlan 1981–A, Ltd. partnership. Several members of K & E decided to invest in 1981–A. They formed an "S" corporation called Narros, Inc., which was a limited partner in Big Creek partnership, which in turn was a partner in the Bethlan 1981–A, Ltd. partnership. Smith's company, MtLand, was the general partner of the Big Creek partnership. Smith disclosed that in consideration for MtLand serving as a general partner of Big Creek, MtLand was to receive an override payment of seven and one-half percent of the profits of the partnership until the payback of the original investment, and a fifteen percent override thereafter (plaintiff's exhibit 22). The compensation of MtLand Energy Corporation, in this scenario, was disclosed and was inalterable. Thus, certain partners of K & E came to a game virtually in progress, the rules of which were not subject to change by the California individuals.

During the same October visit Smith suggested to K & E that the Louisiana oil man, Max Dedman, and his drilling corporation Bethlan Production Co., Inc., with which Big Creek had been involved, was starting a new partnership. This partnership was an infant. K & E could get in on the ground floor. By this Smith meant that the year-end project did not have an established partnership such as Big Creek, and as such, no override payments like the seven and one-half/fifteen percent deal would be involved. K & E's acquisition price could best be described as wholesale as opposed to retail. The year-end project was the Bethlan 1981–C, Ltd. partnership, the ill-fated transaction which forms the basis of this lawsuit.

K & E decided that an enlargement of the partnership would be in order so as to accord KEA clients an opportunity to invest in the mineral exploration, at least indirectly. Personnel at KEA were hounded consistently by firm clients for investment suggestions which had significant profit potential as well as immediate and generous tax write-offs. Predicated upon Smith's declared experience and projection of that experience, tempered by a modicum of conservatism, the old partners in K & E felt that the Smith proposal for an investment in Bethlan 1981–C was sound. This was particularly true since Smith also would be an investor in Bethlan 1981–C and since no personal aggrandizement was coloring his recommendation. The K & E old partners knew that legal and ethical propriety required them to exercise due diligence in analyzing the potential investment of K & E. Therefore, two K & E old partners, Sam Klein and Morton Resnick, journeyed to Louisiana to confer with Mr. Dedman and others as to the intended mineral exploration. While in Louisiana, Klein and Resnick met with Dedman's banker, George Campbell; Dedman's tax attorney, George Snellings; and Pete Caldwell, a driller employed by Max Dedman. They also spoke with two independent drillers, Jim Spillers and B.J. Crowley. Finally, they met with Jim Haddox, a geologist, and Ben Hulsey, a CPA who invested in oil and gas ventures, although not with Max Dedman. Generally, reports of Dedman were positive, with Dedman being described as an active operator in the area. There were, however, a few negative comments. Haddox stated that he would not deal with Bethlan and that Bethlan usually did not deal with the same investors twice. Hulsey thought that K & E could do better than Bethlan, but Hulsey was trying to persuade K & E to invest in a project he was backing in Arkansas. The independent drillers, Spillers and Crowley, thought Dedman charged too much for his wells. Resnick discounted these statements, however, since Spillers and Crowley were in direct competition with Bethlan.

The sun was setting on 1981. In order to obtain a deduction for the lion's share of an investment in 1981, the investment money needed to be paid and the driller prepaid. Having completed its investigation and having been comforted by the assurances and prognostications of friend Smith, K &

E felt secure in opening up the K & E partnership to new partners.

K & E admitted new partners, articles of partnership were drawn, new and old partners made capital contributions to K & E, and K & E made its timely capital contribution to Bethlan 1981–C. The deal, in the parlance of the oil field, flanged up.

It flanged because K & E was informed that everything that should have been done was done. The 1981–C private placement memorandum (plaintiff's exhibit 12–C) required that a minimum of fifteen partnership subscriptions be received by 28 December 1981. This date was chosen in order that the partners could take advantage of the applicable tax benefits for the 1981 tax year. The cost, per unit, was $210,000, which represented the dry hole cost. If a well tests as being one which will produce fugacious minerals in paying quantities, additional costs are incurred and those are referred to as "completion costs." One would find that the necessity to contribute his pro rata share of completion costs is a desirable expenditure. It amounts to throwing good money after good. K & E ultimately subscribed to 2.9 partnership units in the 1981–C, Ltd. partnership (plaintiff exhibit 2). Unfortunately, only 11 partnership units were subscribed to and the offering should have extinguished by its own terms. Instead, Dedman decided to fund the remaining 4 units himself in order to proceed with the project, although the payment for those units was never deposited into the escrow account. Sam Bradley, who was serving as escrow officer, certified that the subscription minimum had been met and released the funds to Dedman. In fact, Bradley advised Resnick and his attorney by phone on 28 December 1981 that the subscription minimum had been met. That the subscription minimum had been met was verified by letter dated 22 January 1982 from Max Dedman at Bethlan Production (plaintiff exhibit 5).

It doesn't take much imagination to predict ensuing events, particularly since these words are written by a federal judge in a case styled *Kaufman & Enzer Joint Venture v. Lansing Maxwell Dedman, et al.*

Some wells were drilled, although not as rapidly as anticipated by the partners of Bethlan 1981–C, some wells tested as productive thereby justifying contribution of completion costs by the partners, some information was disseminated to the partners, some production was sold and runs trickled down to the partners. But all in all, the investment produced precious little. Bethlan went belly-up in bankruptcy and Dedman became, as his name indicates, a dead man when it comes to solvency or response.

K & E wants its money returned. McDonald Smith failed to disclose that in the 1981–C venture he, or his corporation, would receive consideration from Bethlan–Dedman for purchases of Bethlan made by K & E. Although it remained undisclosed until 1983, Bethlan paid Smith, through MtLand and Argosy, a commission for finding new investors to participate in 1981–C. Bethlan paid a total commission of $67,116 to MtLand and $52,882 to Argosy (plaintiff's exhibits 14 and 15). A $15,000 commission was paid for each partnership unit subscribed in the 1981–C project. Bringing in the Kaufman & Enzer Joint Venture was therefore worth $43,500, a substantial sum, not merely a baksheesh. The commission arrangement was not disclosed either explicitly nor implicitly. The fact that Smith explicitly disclosed a commission arrangement on a previous investment relationship with K & E is not sufficient to put K & E on notice that a different commission arrangement was applicable to the 1981–C investment.

The 1981–C investment was mismanaged and should not have closed. The total dollars which were required to be deposited in an escrow account were neither received nor deposited. K & E was misinformed as to that aspect and the attorney for the partnership should not have closed the transaction without ascertaining that the condition of capital contribution in escrow had been fulfilled.

For his part, Smith stated that he disclosed the commission scheme in the 1981–A deal and felt no need for further disclosure in the 1981–C partnership.

Aside from the issue that Narros is a separate legal entity from the Kaufman & Enzer Joint Venture, Smith merely disclosed that MtLand was to receive an override payment in the 1981–A project in consideration of its status as general partner in Big Creek. The Joint Venture was told that 1981–C would not involve such an override payment, since they were getting in on the "ground level," i.e. no partnership such as Big Creek, preexisted. Smith also claims that his compensation was disclosed in the 1981–C Limited Partnership Agreement in a provision which includes "commissions paid to lease brokers" in the definition of "Leasehold Acquisition Costs" (plaintiff exhibit 3 at A–5). Both Klein and Resnick testified that they understood that provision to refer to real estate commissions paid in connection with obtaining a mineral lease. Clearly, that phrase was referring to a real estate type commission and not to the type of commission paid to Smith by Bethlan.

The Court was impressed with defendant Smith's knowledge of mineral exploration projects, the raising of investment capital and protocol of securities regulation. The Court was also convinced that no partner in K & E or KEA had any experience in or knowledge of mineral exploration projects, raising investment capital or protocol of securities regulation. In short, K & E was illiterate in all facets of mineral investment compared to Smith.

Two federal statues are the slabs which support plaintiff's action for return of its purchase price. The parties have stipulated that the partnership interests are securities indeed within the purview of the federal laws. Both statutes protect reasonably informed investors from unscrupulous or manipulative sellers of securities. Both provide for return of the purchase price to the seller. One statute is more generous as it allows for interest to be tacked on to a judgment against the seller and that interest will be calculated from day of acquisition as opposed to date of judgment. Double recovery is not authorized. A more detailed discussion of the statutes is in order.

The plaintiff asserts a claim under § 10(b) of the Securities & Exchange Act of 1934, 15 U.S.C. § 78j(b). To establish a claim for relief under the Act and Rule 10–b–5, K & E must prove:

1. A misrepresentation or omission or other fraudulent device;

2. A purchase or sale of securities in connection with the fraudulent device;

3. Scienter by defendant in making the misrepresentation or omission;

4. Materiality of the misrepresentation or omission;

5. Justifiable reliance on the fraudulent device by plaintiff (or due diligence against it);

6. Damages resulting from the fraudulent device.

*Warren v. Reserve Fund, Inc.,* 728 F.2d 741, 744 (5th Cir.1984). McDonald Smith knowingly failed to disclose the commission arrangement between MtLand Energy (a corporation owned by Smith and G. Reed Petersen) and Bethlan Production 1981–C, Ltd. Smith was aware of and familiar with the private placement memorandum. That document provided, under the paragraph labeled "Selling Arrangements," that:

Units will be offered by Bethlan Production Corporation, the general partner, and its employees and no selling commission will be paid.

Smith's corporation received a commission of $67,116, the lion's share of which was generated by the K & E purchase of 2.9 partnership units at a cost of $478,579.40. Not only did Smith fail to disclose the commission arrangement but also he explicitly warranted to K & E that no commission was to be paid to him, or his corporation, by Bethlan. Smith's deceptive and untruthful actions amount to an extreme departure from the standards of ordinary care and prudence which Smith knew, or should have known, present a danger of misleading the purchaser, K & E. *Broad v. Rockwell International Corp.,* 642 F.2d 929 (5th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). Plain-

tiff proved an omission. The first test of *Warren, supra,* has been satisfied.

The second test of *Warren* has also been passed by the plaintiff. The stipulation of the parties identifies the object of the sale as a security. It is also stipulated that K & E bought that security.

Scienter by Smith, the third test, has been proved by the plaintiff. The Supreme Court defines "scienter" as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, n. 12, 96 S.Ct. 1375, 1381, n. 12, 47 L.Ed.2d 668, 677, n. 12 (1976). The definition is augmented in the Fifth Circuit to include recklessness:

> We here conclude that recklessness can, under certain circumstances, be sufficient to establish scienter for purposes of the cause of action under Rule 10-b-5.

*Huddleston v. Herman and MacLean,* 640 F.2d 534, 545 (5th Cir.1981). The evidence is clear and convincing, as required by *Huddleston, supra,* at 546, that Smith's failure to disclose a commission arrangement and his denial that such an arrangement existed were so egregious that he knew or should have known that a buyer, such as K & E, could be misled by that perfidious conduct. That conduct is equivalent to an intent to deceive, manipulate or defraud.

But was the omission and misrepresentation material? The facts as we find them can best be categorized as a failure to disclose on the part of McDonald Smith. The fact withheld, i.e. the commission arrangement, is material in that a reasonable investor might consider the presence or absence of a commission arrangement an important ingredient in making the investment decision. K & E reasonably believed that the duplicity created by Smith's commission was so significant that the invitation to invest in 1981-C would have been summarily declined.

Smith's failure to disclose triggers a presumption of reliance. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). But even if reliance were not presumed, we find that K & E has passed the test of reasonable reliance as described in *Huddleston, supra.* K & E trusted Smith, K & E was fed virtually every piece of investment bait by Smith, K & E believed Smith to be solely another investor and K & E conducted a due diligence examination of the investment mostly tempered and directed by Smith himself. Had plaintiff known the truth about the commission, no investment in Bethlan 1981-C would have occurred. The Smith falsehood or omission was directly related to plaintiff's loss.

Finally, the issue of damages must be resolved. Plaintiff is entitled to return of its investment, less the amount earned from the investment, less the amount received from any other party in settlement. But plaintiff can recover that sum only if the mendaciousness of McDonald Smith is the proximate cause of the damage inflicted upon the plaintiff.

> The plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.... Absent the requirement of causation, Rule 10b-5 would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission.

*Huddleston, supra* at 549. The selling partnership paid Smith's companies, MtLand and Argosy, $67,116 and $52,882, respectively, as commissions. If those sums had not been paid there is no evidence that plaintiff would not have suffered the same loss that it in fact suffered. In other words, plaintiff's loss was caused by the partnership closing the transaction without the required funds having been deposited in the escrow account. Although

somewhat speculative, it is possible that plaintiff's loss was caused by a dishonest driller. Equally as speculative is the possibility that plaintiff lost money due to no fault other than the absence of oil and gas in paying quantities. But no evidence exists that the plaintiff's loss was caused by Smith's failure to disclose a commission relationship. Plaintiff has not satisfied the final test for recovery under Rule 10–b–5. Plaintiff has failed to connect its loss with defendant's conduct.

■ Plaintiff's inability to recover under 10–b–5 is not an automatic bar to recovery under § 12(2) of the 1933 Securities Act, 15 U.S.C. § 77*l* (2):

> That section creates a cause of action for a purchaser of securities against one who sold him the securities by means of a prospectus or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made not misleading.

> To recover under that provision, the plaintiff must establish that the defendant as a seller of a security under Section 12(2): misrepresented or failed to state material facts to the plaintiff in connection with the sale.... In addition, the plaintiff must show that he had no knowledge of the untruth or omission. However, the plaintiff need not establish that the defendant acted with scienter or that he relied in any way on the defendant's misrepresentations or omissions.

*Junker v. Crory,* 650 F.2d 1349, 1359 (5th Cir.1981). Was the defendant a seller within the contemplation of Section 12(2)? The evidence inexorably leads to an affirmative response. McDonald Smith was the motivating force behind the sale. It was Smith who brought the deal to K & E; it was Smith's credibility which caused K & E to initiate investigation of the investment; it was Smith's previous mineral investment experience which was used as a measuring stick for the 1981–C analysis; it was Smith to whom K & E partners directed the findings of their visit to Louisiana, the state of the location of the leases and the domicile of the driller; it was Smith who did not caution against investment in light of the

information obtained on that visit by K & E partners; it was Smith who counseled K & E partners that the well drilling cost of the 1981–C project was high as compared to other well drilling bids but that a quality product is usually a more expensive product; it was Smith who assuaged any glimmer of pessimism by being in the same investment boat as the K & E partners. Smith precipitated the purchase by K & E. *See Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680 (5th Cir.1971).

■ McDonald Smith, as a seller, misrepresented a material fact, i.e. his commission arrangement with Bethlan. The private placement memorandum issued to plaintiff contains a misleading and incorrect statement which we have previously cited but is worthy of repeating at this time:

> Selling Arrangements: Units will be offered by Bethlan Production Corporation, the general partner, and its employees and no selling commission will be paid.

We reiterate a fact previously found. K & E did not know and could not have known that by the use of reasonable diligence that Smith was in fact to receive a commission on the acquisition by K & E of a partnership interest in Bethlan 1981–C. The tether of trust was so strong between plaintiff and defendant that plaintiff did not require a written certification from defendant that he was not receiving any commission from Bethlan. Like Caesar's wife, Smith was above suspicion.

■ A successful plaintiff in a section 12(2) action may recover "the consideration paid for such security with interest thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. §§ 77*l*(2). The remedy is a rescissionary one which provides for recovery of the sums paid for a security, minus any profits received. *Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). The pretrial order stipulated that the plaintiff invested a total of $478,579.40 and received $34,113.74 as proceeds. The plaintiff also received an initial settlement payment from Bethlan of

$25,000. A settlement with Sam Bradley and his insurer resulted in a payment of $125,000, while a similar arrangement with Frank May and his insurance company brought in $50,000. After subtracting the settlement amounts from the damage award, *Billiot v. Stewart Seacraft, Inc.,* 382 F.2d 662 (5th Cir.1967), the Court finds that the plaintiff is entitled to the sum of $244,465.66. Since section 12(2) is a recissionary remedy, the plaintiff is entitled to prejudgment interest on its award. The avowed purpose of rescission is to return the defrauded purchaser to the status quo ante; it contemplates the return of the injured party to his position prior to the wrongfully induced transaction.[2] *Huddleston v. Herman & MacLean,* 640 F.2d 534, 554 (5th Cir.1981). Prejudgment interest is allowed in section 12(2) actions in an amount which will compensate the plaintiff for the use of his money. *See, e.g., Sheve v. Clark,* 596 F.Supp. 592, 596 (E.D.Mo. 1984). Postjudgment interest will be awarded in accordance with 28 U.S.C. § 1961.[3]

■ Finally, the issue of the third-party demands must be resolved. Smith filed a third-party demand against Kaufman & Enzer Accountants, Inc., and the individual accounting firm members. That claim, also based upon section 12(2), alleges that the accountant members of Kaufman & Enzer Joint Venture were "sellers" vis-a-vis the client members. Since the accountant members falsely stated or omitted to state material facts to the client members, theorizes Smith, he is entitled to contribution should the joint venture recover against him.

Smith's demand must fail for several reasons, the first of which is standing. Section 12(2) provides a remedy against one who sells securities by fraudulent means, but that remedy extends only to purchasers of securities. "Persons who did not buy the security thus lack standing to sue the person who offered or sold it." *Ratner v. Sioux Natural Gas Corp.,* 770 F.2d 512, 517 (5th Cir.1985); *Wolf v. Frank,* 477 F.2d 467, 478 (5th Cir.1973); *Herpich v. Wallace,* 430 F.2d 792, 806 (5th Cir.1970). At no time was Smith a purchaser of securities from the third-party defendants.

■ Additionally, neither the firm nor its members can be considered "sellers" for purposes of section 12(2), consistent with Fifth Circuit jurisprudence. Mere participation in the events leading to the offensive transaction is not enough. *Pharo v. Smith,* 621 F.2d 656, 667 (5th Cir.1980). It must be found that but for the misstatements or omissions of the accounting group the client group would not have participated in the Joint Venture. *Croy v. Campbell,* 624 F.2d at 714. The alleged wrongdoing of the accounting group consisted of the failure to report a smattering of negative comments about Dedman and Bethlan during the "due diligence" trip and the failure to disclose that the accounting group itself was compensating Smith. As previously discussed, the two accounting partners who testified at trial, Sam Klein and Mort Resnick, stated that the few negative comments they encountered on the "due diligence" trip were outweighed by positive recommendations of Dedman's work. Some of the remarks were made by parties who were in competition with Dedman or who were vying with Dedman to attract the Joint Venture as investors. For these reasons, testified Klein and Resnick, they were not overly concerned about the negative comments and therefore did not pass them along to the client group. If the facts examined during the "due diligence" trip failed to raise a red flag with Klein and Resnick, it is unlikely that disclosure of the negative comments would have prevented the client group from investing.

---

2. The § 12(2) offset for "income received" on the security does not encompass the tax benefits received by defrauded investors by virtue of their ownership of the security, because such benefits cannot properly be termed income. *Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.C. 3143, 92 L.Ed.2d 525 (1986).

3. Although § 12(2) provides a recissionary remedy which envisions the return of both sides to the status quo ante, the parties have failed to raise the issue of the return of the securities. *See e.g., Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986).

That the payment made to Smith by the accounting group constituted a material misstatement or omission is fallacious. The partnership memorandum of the Kaufman & Enzer Joint Venture (defendant exhibit 5) disclosed that the accounting group retained a 25% subordinated interest after the partners' contributions were repaid. From this 25%, the accounting group granted Smith a 20% override (defendant exhibit 4). The 25% interest of the accounting group was clearly disclosed and Smith's compensation was to be paid from that interest. Smith's compensation had no impact on the client group. Since the actions of the accounting group were not the proximate cause of the client group's injury, Smith's third-party demand is without merit. *Croy, id.* The Kaufman & Enzer firm, along with the individual members, also filed a cross-claim against Smith seeking contribution should they be found liable on the third-party demand. As the third-party demand of Smith failed, so must the cross-claim upon which it is based.[4]

For written reasons today stated, the plaintiff, Kaufman & Enzer Joint Venture, is entitled to a judgment against McDonald C. Smith in the amount of TWO HUNDRED FORTY–FOUR THOUSAND FOUR HUNDRED SIXTY–FIVE AND 66/100 ($244,465.66) DOLLARS. That sum is to be augmented by interest as provided by law. The third-party demands and the cross-claims are DISMISSED. The plaintiff is hereby ORDERED to submit an appropriate judgment to the Court and opposing counsel, to which opposing counsel will be given ten (10) days to object.

---

**4.** The defendant has alleged that plaintiff's claims are barred by 15 U.S.C. § 77m, which requires a claim to be brought within a year of the misstatement or omission or within a year of the date the misstatement or omission should have been discovered by the exercise of due diligence. Defendant claims that plaintiff should have known something was amiss when its check-in payment for the 2.9 shares of partnership interest was made out to "Bethlan Production 1981–C Ltd. *Escrow Account*" but endorsed by Bethlan Production. The check endorsement has no bearing on defendant Smith, who actively secreted his commission interest.