DONALD W. CROWELL AND SUZANNE C. CROWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crowell v. Commissioner
Docket No. 30831-83.
United States Tax Court
T.C. Memo 1988-305; 1988 Tax Ct. Memo LEXIS 332; 55 T.C.M. (CCH) 1276; T.C.M. (RIA) 88305; July 20, 1988. William R. Nicholas, Boyd J. Black, Thomas G. Bost, and John J. Clair, Jr., for the petitioners. Mark S. Priver, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1975
$  2,096
1976
$  5,555
1977
$ 17,465
1978
$ 56,370
The sole issue for decision is whether capital was a material income-producing factor in the brokerage business of Crowell, Weedon & Co., within the meaning of section 1348. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners, Donald and Suzanne Crowell, resided in San Marino, California at the time they filed their joint petition. Suzanne Crowell is a petitioner solely by filing a joint return with *334 her husband. All references to petitioner will be to Donald Crowell, unless otherwise indicated. During the years at issue, petitioner was an active member of a California partnership, Crowell, Weedon & Co., (the "firm" or "partnership"), a moderately-sized, regional, stock brokerage firm operating predominantly at the retail level with the general public as customers. It has local offices in Los Angeles, Orange and northern San Diego counties of California. The partnership's business consists primarily of buying and selling securities for its clients on the various stock exchanges and in the over-the-counter ("OTC") markets. Acting as a broker, in an agency capacity, the partnership buys and sells securities for its clients and charges a commission on each transaction. Occasionally, the partnership deals with clients in a principal capacity wherein the firm may purchase or sell securities on behalf of a client or another dealer at a net price that may or may not include a commission. To accommodate its clients' needs, the firm may also participate from time to time as a member of an underwriting group offering newly issued securities. It may also engage in the sale of mutual *335 funds and offer investment advisory services to its clients on a variety of levels. The firm sometimes extends credit to its customers who have purchased their securities on margin and acts as a depository in holding securities and cash owned by these customers. The petitioner, a partner since July 1, 1964, devoted his full-time efforts to the partnership's business during the years in question. He has been the managing partner of the partnership since 1968 and was so during the years at issue. Petitioner's personal activities during the years at issue included executing orders for his own large clientele and generating additional client business for the partnership, as well as overseeing the operation of the partnership. Unlike the firm's account executives, petitioner, as a partner, was not paid commissions for his services. Rather, any commission income he generated became partnership income and was distributed to him as partnership distributions. Petitioner received a B.A. in Economics from Stanford University in 1956 and an M.B.A. from the graduate School of Business at Stanford University in 1958. He also has been very active in the industry having served on the councils *336 or boards of a number of trade organizations. In 1975, petitioner owned an approximate 15-percent interest in the partnership's capital, profit and losses. In 1976, petitioner purchased an additional 10-percent interest in the partnership which increased his partnership interest to approximately 25 percent. Otherwise, during the years at issue, petitioner's percentage of interest in the partnership remained relatively constant, changing only slightly as other partners withdrew or were admitted to the partnership. Petitioner received or was credited with his share of partnership income and also received interest payments on his capital account retained with the partnership. Petitioner was entitled to receive cash distributions from a drawing account established for this purpose which were credited against his distributive share of partnership income. The partnership has been successful due, to a great extent, to the personal relationship that the partnership has with its clients. The partnership is, in most respects, a personal service business requiring close communications with clients and within the partnership. The partnership maintains a large research department to render *337 advice with regard to stocks in which the partnership's clients have an investment interest. During the years in question, the partnership had approximately 60,000 customer accounts. At any time, about 20,000 of these accounts would be active. The partnership has never had an unprofitable year. The partnership engaged in a variety of activities and services including stock and security brokerage, underwriting participations, specialist post trading, arranging private financings and mergers, advisory services, proxy solicitations and extending credit on margin accounts. The partnership reports the income it derives from each of these activities on its consolidated operating statements. Approximately two thirds of the income received by the partnership was from its brokerage services. The profit resulted primarily from buying and selling securities for clients on the various stock exchanges for which the partnership charged a commission on each transaction. Commissions represent the amount the partnership is paid for advising clients and executing transactions for its clients' accounts. In certain so-called "principal" transactions, the firm's profit is produced by markups *338 or markdowns applied to shares purchased or sold for clients' accounts. In "principal trades" the partnership's profit or commission results from the spread (price differential) between the price paid (bid price) for a security and the price at which the same security is sold (ask price), the purchase and sale having been brokered by an account executive or partner of the partnership. The client is required to have funds covering any purchase in his account with the partnership by the settlement date, usually a prescribed number of days from the transaction date. The partnership does not use its own funds to close transactions for clients. In the underwriting of new issues, the managing underwriter negotiates with the issuer for a specified number of shares at a discount price which are allocated to participating firms ordinarily in amounts required to meet the purchase requirements of the firms' clients. During the years in question, the partnership did not manage any underwritings, although it did participate as a member of an underwriting group or a selling group on numerous occasions. The partnership's participation in the underwriting of new issues was done principally to *339 accommodate its clients' desires. The partnership's income from its underwriting activity (7-16 percent of gross income) was derived primarily from the discount or selling concessions on those shares it received to cover clients' purchases, less its share of the underwriting expenses passed on by the managing underwriters. The partnership employed specialist post traders on the floor of the Pacific Stock Exchange. These specialists make markets in certain stocks of interest to the firm's clients and facilitate clients' purchases and sales at favorable prices. This activity produced fees and profit on the spread between the bid and ask prices, approximately 2-7 percent of the firm's gross income. In connection with its business and as a service to its clientele, the partnership extended credit on margin accounts. To purchase a stock on margin, the client must put up a minimum amount of cash, normally at least 50 percent of the cost of the security. For the balance due, the partnership arranged a margin loan to the client. The client's securities were used as collateral for the margin loans. The capital used for margin loans was obtained by the partnership in part as short-term *340 loans from banks. In addition, free credit balances of other clients were used for loans to margin customers under rules established by the Securities and Exchange Commission. Free credit balances are deposits of clients' cash held by the partnership pending disbursement or reinvestment. No interest was paid by the partnership on free credit balances. During the years in issue, the partnership had about 700 margin accounts representing approximately 1 percent of its total clientele, or 4 percent of its active clientele. On executing an order for a margin account client, the partnership receives a commission as in any other brokerage transaction. To purchase securities partially on credit, clients could borrow on their securities directly from such banks, but as less favorable terms than the partnership might arrange for such clients' benefit. The partnership also earned income from investment management and advice, soliciting proxies on behalf of private companies, arranging private financing for corporate clients, acting as a finder in locating merger partners for corporate clients, evaluating portfolios and through its employees serving as directors of corporations. The partnership *341 also earned commissions on the sale of mutual fund shares and term insurance for annuities. The income that the partnership receives from these other activities in minor by comparison to the partnership's brokerage commission income. The partnership did not purchase stock for its own account during the years in question and did not have or maintain an inventory of stocks, bonds or other securities for resale to customers or for its own profit. The partnership also did not invest on its own account in real estate, gas, oil or similar syndications during this period. Under Securities and Exchange Commission rules, the partnership was required to maintain a certain absolute amount of net capital, as well as a ratio of net capital to aggregate indebtedness. During the partnership's fiscal year 1975, it maintained that net capital in accordance with rule 325 of the New York Stock Exchange regulations and operating guidelines. Thereafter, the partnership satisfied these requirements pursuant to rule 15C3-1 of the Securities Amendment Act of 1975 (uniform net capital rule). The purpose of this rule, like rule 325, is to ensure that a broker or dealer of securities at all times have *342 sufficient liquid assets [2] to cover its indebtedness. Net capital is therefore defined by the net liquid assets of the broker or dealer less certain other productions. If an asset cannot be readily converted to cash, [3] then it must be deducted in computing net capital. The rationale behind the requirements of maintaining a certain minimum net capital is for the protection of clients. In this regard, the Securities and Exchange Commission Customer Protection Rule, Rule 15C3-3, was adopted to accomplish several objectives. The first was to ensure that the customer funds held by a broker/dealer are deployed in safe areas of the business related to customer servicing. The second objective is to require the broker/dealer to obtain prompt possession or control of fully paid securities and excess margin securities carried by the broker/dealer for the account of customers and further to require the broker/dealer to act within designated time frames where possession or control has not been established. The partnership does not have inventories or substantial investments in plant machinery or other equipment. *343 ULTIMATE FINDING OF FACT Capital was not a material income-producing factor in the brokerage business of Crowell, Weedon & Co., within the meaning of section 1348. OPINION During the years in issue, section 1348[4] provided individual taxpayers with limited relief wherby "personal service income" [5] was taxed at marginal rates no higher than 50 percent. The issue here is whether petitioner's earnings from his brokerage partnership were earned and subject to the 50-percent maximum limitation or unearned income, which resolves ultimately to whether capital was a material income-producing factor in the partnership. *344 Respondent contends that capital was material to the production of a substantial portion of the partnership's income and proposes a limit petitioner's personal service income to 30 percent of his share of the partnership's net profit. Respondent bases this contention on the partnership's activities primarily in connection with its "Principal Transactions" as defined in its financial statements, its underwriting participations, and its extension of credit on margin accounts. Respondent argues that securities were indeed "capital" in these transactions because the partnership's employees were not acting as brokers with respect to their clients, but principals, bankers and merchants, and that in these situations services were merely incidental to the creation of income. Petitioner counters that the partnership was engaged during the years in issue almost exclusively in the brokerage of stock or securities for clients, a personal service from which commissions and fees are derived. Inasmuch as the partnership income consists principally of fees, commissions and other compensation for personal services rendered by the partnership's employees and partners, capital was not a material *345 income-producing factor, and, accordingly, petitioner is entitled to the benefit of the section 1348 limitation. We agree with petitioner. Section 1.1348-3(a)(ii), Income Tax Regs., states that: Whether capital is a material income-producing factor must be determined by reference to all the facts in each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensations for personal services performed by an individual. Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment *346 in professional equipment or in the physical plant constituting the office form which he conducts his practice since has capital investment is regarded only as incidental to his professional practice. In applying these rules, the Court has inquired into the nature of the partnership's business, essentially distinguishing on the basis of whether the nature of the business was selling goods or providing services. A distinction is therefore drawn between businesses in which capital itself produces income and those in which the employment of capital is merely incidental to the provision of services. To be a "material" income-producing factor, capital must generate a substantial portion of a firm's gross income. See Gaudern v. Commissioner,77 T.C. 1305, 1310 (1981); Moore v. Commissioner,71 T.C. 533 (1979); Rousku v. Commissioner,56 T.C. 548 (1971). Capital is not material to the production of income where the activity generating income is essentially personal services or professional skills. See Bruno v. Commissioner,71 T.C. 191, 200-201 (1978). *347 There is no issue over whether the office equipment, chairs, desks and other miscellaneous fixed assets of the partnership comprises "capital" as used in these sections. Respondent argues that many of petitioner's partnership activities are mercantile in nature, causing it to function as a merchant in the selling of its inventory, i.e., securities. Respondent continues that any distinctions petitioner may be able to conjure up between the securities business and other more traditional types of merchant businesses resides in the peculiarities in the securities business overall. Transfer of commodities between buyers and sellers are often in book or computer entries, and the trading of securities is ordinarily accomplished in a mere 5 days so that the partnership would rarely ever have to take securities into inventory. Moreover, he continues, even if petitioner's firm did not have its own inventory of stocks, it would not be necessary for the partnership to have securities in inventory in order for it to trade for its own account. [6]
*348 Respondent contends that all of the partnership's or broker's "principal" transactions are for their own accounts. Respondent further points to the partnership's margin business and argues that in this situation capital is employed in the purest of senses because when the partnership extends credit to its customers, it really is making partnership loans to its customers. Finally, he refers to the interest income earned by the partnership in connection with the margin accounts. We cannot agree with respondent's view of the partnership's business or his analysis of the case law. Section 1348 demands a thorough review of the facts of each individual case. In recent cases applying section 1348, this Court has focused on whether the taxpayer's profit stemmed from its capital or inventory, or rather was attributable to the personal services of the taxpayer. [7] For example, in Gaudern v. Commissioner, supra, petitioner owned and operated a sole proprietorship in the business of selling bowling supplies, both at wholesale and retail. When purchasing bowling balls for inventory, *349 it was the manufacturer's practice to extend credit to purchasers such as petitioner under a concept known as "dating." Under the "dating" practice, the merchandise was delivered without any payment for a prearrange period of time. Petitioner there argued that the capital was not material in his business because he turned over the inventory so rapidly that he was not required to furnish the capital to pay for such inventory. We rejected such an argument. The facts surrounding the purchase of inventory for petitioner's business clearly showed that virtually all the profits of the business were attributable to the sale of the bowling equipment. To operate that business, a large inventory was required. The receipts of petitioner, therefore, were not fees for rendering personal services but were prices paid to purchase bowling equipment. Specifically, the Court noted: The petitioner was more than a mere broker; he was an independent businessman who purchased the inventory and became the owner of it; he hoped to resell it at a profit and did so with considerable success. Once he purchased the inventory, he bore the risks of an owner; in the case of a loss by fire, or in the case *350 of a sale for which he would not collect, the loss was his. His income was attributable to the fact that he was able to buy and sell at a profit; it was not attributable to fees for services rendered by him. See Gaudern v. Commissioner, supra, at 1312. In Moore v. Commissioner,71 T.C. 533, 539 (1979), the taxpayers were engaged in the retail grocery business and produced expert testimony that over 90 percent of the profits of their business was produced from their personal services. We rejected this argument and found that capital was a material income-producing factor in their business: Although petitioners' services were substantial and important in preparing and presenting the store's inventory for retail sale, a substantial portion of their business is attributable to the use of capital. * * *. * * * The gross income of their business came entirely from the price paid for its groceries, not from any fees, commissions, or other compensation paid directly for personal services. 71 T.C. at 539. *351 In the instant case, the uncontested evidence is that the partnership maintained no inventories of stocks or bonds and had no cost of goods sold, and did not trade for its own account. A typical "principal" transaction involves 1) a stock which Client A wants to sell and Client B wants to buy and 2) an accommodation by the partnership by "crossing the trade" between such clients. The partnership does not purchase the stock from one client and then sell it to the other client. Just as with any other brokerage transaction, a settlement date is established and a simultanious closing of the transaction occurs. If the "bid" price for the stock is $ 10 and the "ask" price is $ 10.50, the selling client will receive $ 10 and the buying client will pay $ 10.50. The broker representing the buying client will receive a commission of $ .25 and the broker representing the selling client will receive $ .25. This works to the benefit of the partnership's clients since they pay and receive respectively the same amounts they would if the transaction were executed on an exchange, and both avoid additional brokerage commissions. There is no "inventory" of stock for the partnership *352 to sell or which generates income. Rather, petitioner's skill as a broker effectuates the transaction, and the partnership's profit stems from the "spread." The underwriting participation and the margin accounts were necessary extensions of the partnership's brokerage business. In connection with the underwritings, the partnership functioned as a intermediary between their clients and the issuer and acted as broker for the purchaser in sales of such securities. In connection with the margin accounts, the recent case of Barnes v. Commissioner,T.C. Memo. 1987-544, is of assistance. In Barnes, the taxpayer was a partner in a brokerage firm, which did not own securities for its own account or for resale and did not act as an underwriter for securities. However, the firm filled orders to sell securities for customers through securities exchanges or the OTC markets, for which it received commissions, or through principal transactions with other brokers from which it received spreads equivalent to commissions. Some of the firm's customers maintainedmargin accounts with the firm and paid the firm interest on such accounts. The margin accounts were financed partly *353 out of the firm capital and partly out of money that the firm borrowed from banks using securities in the accounts as collateral. During the pertinent years, the firm received interest from customers who carried margin accounts. The firm recognized net interest income from 6 percent to over 11 percent as a percentage of gross income in each relevant year. In Barnes, respondent argued that because capital was material to the production of the firm's income, the taxpayers could not avail themselves of the 50-percent maximum rates for taxation of personal service income under section 1348. In that case, we found that the firm's business was essentially one of providing services: Although the firm arranged bank financing for its customers, capital was not vital to the production of any substantial portion of the firm's income. Customers purchased securities on margin in order to avail themselves of the firm's professional skills. Maintenance of customer margin accounts was part and parcel of the firm's brokerage activity; securities purchased on margin were simply the materials with which the firm worked. The firm's income consisted principally of commissions and fees; interest *354 earned on the margin accounts was incidental to the firm's principal sources of revenue. We conclude that capital was not a material income-producing factor for purposes of section 1348. [54 T.C.M. 972, 975; 56 P-H Memo T.C. para. 87,544, at 87-2930 (1987).] We find the facts in this case to be substantially similar. The fact that the partnership, as an accommodation to clients, maintained margin account for a small percentage of its clients does not change the result that capital was not a material income-producing factor in petitioner's business. Only about 1 percent of the partnership's accounts were on margin, and any profit received in the form of interest income, after netting out interest paid to banks on loans incurred to carry margin accounts, was insubstantial in comparison with the other sources of the partnership's income. The purchase on margin by one of the partnership's clients generated commission income for the partnership just as in any other brokerage transaction. The partnership was merely providing a service for its clients by extending margin credit and was not using substantial amounts of its own capital to finance these *355 accounts. Finally, we disagree with respondent that the Securities and Exchange Commission rules governing capital requirements for brokerage firms is evidence that capital is required and, a fortiori, a material income-producing factor in petitioner's business. The rules were established to ensure that a broker or dealer of securities has a sufficient amount of liquidity to protect the clients' interests. Moreover, capital required to meet regulatory mandates is not necessarily a material income-producing factor. See Bruno v. Commissioner,71 T.C. 191 (1978). The income earned by the partnership consisted principally of commissions, fees and other service charges. Capital was not a material income-producing factor. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Representative examples of liquid assets which are includible in a firm's computation of net capital are 1) cash; 2) money due from customers (customer debit balances or receivables); 3) money due from other brokers or dealers; and 4) securities owned by the firm. ↩
3. Representative examples of nonliquid assets which must be deducted in computing a firm's net capital are 1) exchange memberships; 2) furniture and fixtures; 3) prepaid expenses; 4) goodwill; 5) organization expenses; 6) unsecured advances to officers; 7) securities with no ready market; and 8) unregistered stocks owned by the broker/dealer. ↩
4. For the years 1977 and 1978, the pertinent provisions of section 1348 read as follows: SEC. 1348. 50-Percent Maximum Rate on Personal Service Income. (a) General Rule. -- If for any taxable year an individual has personal service taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall, unless the taxpayer chooses the benefits of part I (relating to income averaging), be the sum of -- (1) the tax imposed by section 1 on the highest amount of taxable income on which the rate of tax does not exceed 50 percent, (2) 50 percent of the amount by which his personal service taxable income exceeds the amount of taxable income specified in paragraph (1) of this subsection, and (3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his personal service taxable income. (b) Definitions. -- For purposes of this section -- (1) Personal service income. -- (A) In general. -- The term "personal service income" means any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b) or which is an amount received as a pension or annuity. For taxable years beginning before December 31, 1976, section 1348 provided for a 50-percent maximum tax rate on "earned income." Section 1348 was amended by section 302(a)↩ of Pub. L. 94-455, 90 Stat. 1520, 1554 to provide for a 50-percent maximum tax rate on "personal service income." In the context of this case, there is no substantive difference. 5. "Personal Service Income" was defined in section 911(b) which reads: SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (b) Definition of Earned Income. -- For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered * * *. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income. ↩
6. Respondent cites the case of Shivangi v. Dean Witter Reynolds, Inc.,637 F. Supp. 1001, 1003↩ (S.D. Miss. 1986) as support for this assertion. We do not similarly read this case. 7. For an overview of the several cases discussing this issue, see Barnes v. Commissioner,T.C. Memo. 1987-544↩.