Gordon D. GEORGE, Jr., Michael
Morin and D.S. Evans

v.

BLUE DIAMOND PETROLEUM, INC.
d/b/a Moss Creek Exploration, Inc.,
Decker & Associates, Inc., Richard E.
Decker, and Rena L. Decker.

Civ. A. No. 86–3496.

United States District Court,
W.D. Louisiana,
Shreveport Division.

July 20, 1989.

M. Thomas Arceneaux, Davidson, Nix &
Arceneaux, Shreveport, La., for plaintiffs.

James R. Madison, Wiener, Weiss, Madison & Howell, Shreveport, La., for Blue Diamond.

Richard E. Hiller, Shreveport, La., for Deckers.

## MEMORANDUM OPINION

STAGG, Chief Judge.

The instant action was filed on November 21, 1986, alleging various acts of fraud in connection with plaintiffs' purchases of oil and gas interests sold by the defendants. Plaintiffs seek damages pursuant to Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1); Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2); Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder; 18 U.S.C. § 1961 et seq. (hereinafter, "RICO"); and La.R.S. 51:1401, et seq. Additionally, plaintiffs demanded an accounting for all revenues and expenses attributable to their interests.[1] The case was tried without a jury on June 5–6, 1989.

### I.

The following facts are established by the testimony, exhibits and the stipulations filed in the record. Decker & Associates, Inc. (hereinafter, "Associates"), is a Louisiana Corporation formed in February, 1983 by Richard Decker, Rena Decker and Glen Graves for the purpose of drilling and prospecting for oil, gas and other minerals in Texas and elsewhere, as well as engaging in attracting persons to invest in its prospecting ventures. Richard Decker, a shareholder, director and president of Associates, is an experienced petroleum geologist with a B.A. degree in geology from Muskingum College in New Concord, Ohio. He also attended graduate school at the University of Florida. Since 1962, he has actively practiced petroleum geology and has become skilled at geological mapping and the interpretation and reading of geological logs and core analyses. In September, 1982, he married Rena Decker. At all times relevant to this action, Rena Decker was a shareholder, director and vice-president of Associates.

Associates entered into two joint ventures with Moss Creek Petroleum, Inc.[2] (hereinafter, "Moss Creek"), to market, drill and operate a drilling venture known as the Nacogdoches Queen City Prospect in Nacogdoches County, Texas. Apparently, Moss Creek was anxious to enlist the aid of Associates in the venture, as a result of Moss Creek's poor financial condition.

The first agreement between Associates and Moss Creek was entered into on March 16, 1983. According to that agreement, Associates would raise the necessary venture capital through the investments of third parties. These third parties would participate in ten well drilling ventures at an estimated cost of $30,525 per well, paying 100% of the cost to earn a 75% working interest and 75% of the net revenue interest on the leases. The remaining 25% interest was to be divided as follows: (1) 15% to Moss Creek; (2) 5% to Associates and (3) 5% to a third party, as compensation for raising venture capital for Associates. Associates and Moss Creek were to jointly drill and complete the wells. All cash profits remaining after drilling and completion costs of each venture were to be split on a 50/50 basis between Associates and Moss Creek. Moss Creek would operate the wells after completion, while Associates would perform engineering services on an "as needed basis" at standard rates for such services.

Pursuant to this agreement, Richard Decker prepared an offering circular (hereinafter, "Mast–A circular") for the sale of undivided interests in oil and gas leases for what became known as the "Mast–A Prospect". The Mast–A circular was mailed by

---

1. Plaintiffs abandoned their claims pursuant to La.R.S. 51:1401, et seq., as prescribed. See, Plaintiff's Proposed Findings of Fact and Conclusions of Law at 36, para. 50. Plaintiffs' claims for an accounting have likewise been abandoned.

2. Defendant, Blue Diamond Petroleum, Inc., operated under the name Moss Creek Exploration, Inc. Plaintiffs compromised their claims with Blue Diamond, and that party made no appearance at trial.

Richard Decker to investors and potential investors in California, Texas, Louisiana, Massachusetts and Mississippi.

The Mast–A circular was broken down into sections and contained exhibits including maps and a "Laboratory Water Analysis". In the section labeled "Conclusions", the circular stated:

Development of the Nacogdoches Queen City acreage block offers an excellent investment potential to the participants for the following reasons:

1. The drilling program planned by Moss Creek Petroleum, Inc. and Decker & Associates, Inc. is an extremely low-risk venture with a reasonable projected 6.66:1 return on investment.

2. The time required for development, drilling and completion is only a few days with cash flow coming back to participants within 30 to 60 days after drilling is started.

3. The low initial investment cost on a per well basis spreads the risk of obtaining a total of 70 BOPD of production across ten different wells.

4. The high percentage of intangible versus tangible costs coupled with a rapid projected payout period of 10 months is attractive from an investment tax standpoint.

5. The Nacogdoches oil field area offers excellent future development potential across several thousand acres of leaseholds and farmouts where few wells have been drilled.

The Mast–A circular contained no information about the offerors, the principals, officers or directors of the offerors, the financial condition of the offerors or their principals, officers or directors, or the experience of Associates or any of its personnel in evaluating geological prospects and drilling and completing oil wells. Similarly, it contained no biographical descriptions or data about any of the key personnel that would be involved in the decision making

process with respect to the Mast–A Prospect.

Important details relative to the financial arrangements between Associates and Moss Creek were also undisclosed. Chris Schufland, a field engineer for Associates, estimated the cost of drilling per well to be approximately $18,000. The Mast–A circular, however, estimated the cost to be more than $30,000. Richard Decker admitted that Associates and Moss Creek anticipated making a substantial profit, i.e., Associates and Moss Creek would split approximately $120,000. This profit was not disclosed. Similarly, the circular also failed to disclose that Associates and Moss Creek would receive a carried working interest in the wells.

Although Richard Decker determined what information would be included in the circular and personally prepared the maps, analysis and other exhibits, he was substantially assisted by Normand Roy. Roy spent numerous hours at the Decker home [3] helping prepare the circular. He also actively solicited investors for the Mast–A Prospect in several different states. For his efforts, Roy was to receive a 1% carried working interest and an 8% commission on investments he brought in. It is undisputed that Roy had no personal experience or knowledge of the oil and gas industry. He testified that Richard Decker gave him instructions on what to say to potential investors.

Associates and Moss Creek entered into a second letter agreement on October 16, 1983. Like their earlier arrangement, Associates and Moss Creek agreed to jointly drill and complete six additional wells. After completion, Moss Creek was to operate the wells, while Associates would perform engineering services. All profits remaining after completion of the wells were to be split 50/50 between Associates and Moss Creek. In accordance with this agreement, during September, 1983, Richard Decker prepared another offering circular [4] (here-

3. During the period in question, Associates conducted business out of the Decker's residence.

4. A second Mast–B circular was prepared in November, 1983. Plaintiffs' Exhibit 19. It is

unclear why a second Mast–B circular was prepared. The two Mast–B circulars are identical in all material respects.

inafter, "Mast–B circular") for the sale of undivided interests in oil and gas leases for what has become known as the "Mast–B Prospect". The Mast–B Prospect involved acreage immediately adjacent to the land involved in the Mast–A Prospect. Like the Mast–A circular, the Mast–B circular was mailed by the defendants to investors and potential investors in California, Texas, Louisiana, Massachusetts and Mississippi. The Mast–B circular contained numerous exhibits, the majority of which were identical to those contained in the Mast–A circular. The Mast–B circular also contained an "estimated cost/profitability analysis". This analysis is remarkably similar to that contained in the Mast–A circular. Finally, the Mast–B circular also contained a set of conclusions. This section of the Mast–B circular states that the Mast–B Prospect offers an excellent investment potential because:

1. The drilling program planned by Moss Creek Petroleum, Inc., and Decker & Associates, Inc., is an extremely low-risk venture with a reasonably projected 7.28: 1 [ROI].

2. The low initial investment cost on a per well basis spreads the risk of obtaining a total of 36 BOPD of production across six wells.

3. The high percentage of percentage of [sic] intangible versus tangible write off coupled with a fairly rapid projected payout of 11 months is attractive from a tax shelter standpoint.

4. The Nacogdoches area offers excellent future development potential across several thousand acres of leaseholds and farmouts that have had few test wells drilled.

With respect to the Mast–B Prospect, it is undisputed that several of the investors had little or no experience in oil and gas investments, and no attempt was made to determine such investors' experience, level of sophistication, access to expert or experienced investment advice or ability to withstand a total loss on the investment.

Like the Mast–A circular, the Mast–B circular is remarkable for what was not disclosed. The Mast–B circular contained no information about Moss Creek, Associates or the Deckers, their financial conditions or their experience in evaluating geological prospects and drilling and completing oil wells. Similarly, it did not disclose that Richard Decker, Rena Decker and Normand Roy would receive commissions on interests sold to investors. Additionally, like the Mast–A circular, the Mast–B circular failed to disclose that a portion of the estimated cost would be paid to Richard Decker or to Associates for services performed with respect to these wells.

Gordon George met Rena Decker when Mrs. Decker was working as a real estate agent for Normand Roy. At the time of their meeting, George and his wife were interested in investing money the couple had received as proceeds from the sale of a home. As fate would have it, the subject of oil and gas came into the conversation. Mrs. Decker informed George of the great success she and her husband had with a previous well.[5] Mrs. Decker introduced George to Richard Decker in September, 1983. During that meeting, George and the Deckers discussed the Mast–B venture and how the venture would be operated. George was interested; however, he insisted on visiting the field before making an investment.

Subsequently, George, Richard Decker, and Donnie Jackson, a' long-time friend of George's, visited the field. Although Jackson was an engineer, he had no expertise or experience in geology or petroleum engineering. George insisted Jackson accompany him, since George wanted to make sure that "the workings of an oil well were there". At the field, Mr. Decker opened a faucet emitting a black, oily liquid. George was impressed.

George met with Richard Decker again in November. During lunch, the two discussed various technical aspects of drilling for oil. It was at this point that George

---

**5.** It is unclear whether George was told that this successful well was unrelated to the Mast Prospect.

received a copy of the Mast–B circular. He and Decker reviewed it and went over the conclusions. Sometime after this, George tendered his check for $9,157.50.[6]

Michael Morin and D.S. Evans became acquainted with the Mast–B Prospect through Normand Roy. Neither Morin nor Evans had any experience or expertise with oil and gas. Evans had made real estate investments in the past through Roy, and Roy informed him that he had a good prospect for an oil and gas investment. Roy visited with Evans at Evans' office in Shreveport, Louisiana. Roy told Evans that he had an investment in an oil field that should make a lot of money, and that the project would be done on a turnkey basis, so that all that would be at risk would be an initial investment. Evans told Roy that he expected to have some additional income in approximately a week. At that time, Roy also told Evans that Rena Decker worked for Roy. Roy informed Evans that the Mast–A Prospect was on schedule and doing well.

Approximately one week later, on December 15, 1983, Roy again visited with Evans at Evans' office. There, Evans signed a contract and delivered his check for $9,157.50. Although he had been shown a copy of the Mast–A circular, at the time he signed the contract and delivered his check, Evans had not been provided with a copy of the Mast–B circular.

Like George and Evans, Michael Morin had never before invested in an oil and gas venture. Morin contacted Roy about purchasing rental properties as an investment. The evidence reflects that Roy mentioned the Mast–B Prospect. During the discussions, Roy told Morin that he was acting on behalf of Richard Decker.

On October 27, 1983, Morin signed a contract relating to the Mast–B Prospect. Prior to that time, he was not provided with any prospectus, offering memorandum or circular of any kind whatsoever. He had, however, seen a copy of the Mast–A circu-

lar. Like George and Evans, Morin invested $9,157.50.

After the investments, Morin and Evans talked to Roy on several occasions. At all times, Roy indicated that the wells were being drilled and doing well. In approximately October, 1984, Richard Decker told Morin that he still felt good about the Prospect and that there was "definitely oil down there". After numerous calls to Roy and the Deckers, plaintiffs were told to contact Tim Rabine of Moss Creek to check on the status of the Prospect. In July, 1984, Tim Rabine, as controller for Moss Creek, began to mail progress reports to plaintiffs. In February, 1986, plaintiffs received a bill from Moss Creek indicating they owed additional sums of money. Shocked, they sought legal advice, and this suit resulted.

## II.

Plaintiffs' most substantial claims are made pursuant to RICO, 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1964(c) provides for the recovery of treble damages, costs and reasonable attorney's fees. 18 U.S.C. § 1964(c).

For plaintiffs to prevail on their RICO claims, the parties agree that plaintiffs must show: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and (5) injury as a result of such conduct. *Sedima S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 424 (5th Cir.1987).

As the Fifth Circuit has explained, the object of all civil RICO actions is the RICO "person", the defendant. *Delta*

---

**6.** Although the stipulations filed in the record state that George tendered his check between October 15 and October 25, 1983, George testi-

fied that his check was not delivered until November 21, 1983. There is no basis in the record to question George's veracity.

*Truck & Tractor, Inc. v. J.I. Case Company,* 855 F.2d 241, 242 (5th Cir.1988). Person is broadly defined to include "any individual or entity capable of holding a legal or beneficial interest in property". 18 U.S.C. § 1961(3). The Fifth Circuit has advised that the RICO person must be one that either poses or has posed a continuous threat of engaging in acts of racketeering. *Delta Truck & Tractor, Inc., supra.*

The defendants in this case clearly meet the RICO definition of "person". It cannot seriously be disputed but that these defendants are capable of holding legal or beneficial interests in property. The closer question in this case is whether these "persons" pose or have posed a continuous threat in engaging in active racketeering. After careful consideration, the court concludes that the continuous threat requirement has been met. The defendants, as will be discussed *infra,* committed numerous predicate acts of fraud with respect to their participation in the Mast–A Prospect. Later, the defendants committed additional predicate acts of fraud with respect to the Mast–B Prospect. The evidence in this case clearly shows that additional prospects, i.e., a Mast–C Prospect and a Mast–D Prospect, were planned by the defendants.[7] Thus, this is not a case like *Procter and Gamble Company v. Big Apple Industrial Buildings, Inc.,* 655 F.Supp. 1179 (S.D.N.Y.1987) where the defendants were engaged only in a single lawful project of finite scope and duration—constructing a television studio for a customer.

Continuity has also been incorporated into the enterprise element of Section 1962. RICO defines an enterprise to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity". 18 U.S.C. § 1961(4).

Plaintiffs argue that three enterprises exist under the facts of this case. First, plaintiffs argue that Associates is a Louisiana corporation and, therefore, constitutes an enterprise. Second, plaintiffs argue

that Associates and Moss Creek constitute an enterprise, since they entered into joint venture arrangements to offer the Mast–A and Mast–B Prospects. Finally, plaintiffs argue that Richard Decker and Rena Decker, as officers, directors and shareholders of Associates, took an active part in the business of Associates and the Mast–A and Mast–B Prospects, so that they were each associated in fact with Associates and Moss Creek.

■ Plaintiffs' argument that Associates constitutes an enterprise must fail. In *Bishop v. Corbitt Marine Ways, Inc.,* 802 F.2d 122, 123 (5th Cir.1986), the Fifth Circuit, adopting the reasoning of the Seventh Circuit in *Haroco, Inc. v. American National Bank & Trust Company of Chicago,* 747 F.2d 384, 400 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), held that where subsection (c) violations are concerned, the "person" and the "enterprise" must be distinct. In *Haroco,* the Seventh Circuit found that the use of the terms "employed by" and "associated with" used in Section 1962(c) appears to contemplate a person distinct from the enterprise.

Here, Associates has been joined as a defendant, and, therefore, plaintiffs must necessarily contend that Associates is a "person" subject to liability under Section 1964(c). It necessarily follows that Associates cannot constitute the RICO "enterprise". This does not mean that no enterprise existed. Indeed, it seems clear that Associates and Moss Creek constituted an "association-in-fact" enterprise.

■ An association-in-fact enterprise (1) must have an existence separate and apart from the pattern of racketeering; (2) must be an ongoing organization; and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure. *Delta Truck & Tractor, Inc., supra,* at 243. Thus, the enterprise must not be one that briefly flourishes and fades. Continuity, therefore, is also a necessary attribute of an association-in-fact enterprise.

---

7. An offering circular for the Mast–D Prospect    was prepared in November, 1983.

■ The court finds that the contractual arrangements entered into between Associates and Moss Creek constitute the necessary enterprise. Associates and Moss Creek established a relationship to facilitate the search for oil and gas in Nacogdoches County, Texas. This relationship was formed in part because of Moss Creek's need for financial help in its drilling ventures. After forming, promoting and commencing drilling on the Mast–A Prospect, Moss Creek and Associates began work on the Mast–B Prospect. The evidence indicates that additional prospects, i.e., the Mast–C Prospect and the Mast–D Prospects, were contemplated. As mentioned, a Mast–D circular had already been prepared at the time this suit was filed. Thus, Associates and Moss Creek did not associate together for the sole purpose of drilling only one oil well. Likewise, they did not join together for the sole purpose of committing one or more predicate acts. The evidence indicates instead that Associates and Moss Creek contemplated and established a long-term, on-going organization. Thus, this case is not like *Montesano, supra,* where the defendants allegedly formed an organization for the purpose of illegally repossessing plaintiff's boat. The principal difference, of course, is that Associates and Moss Creek had no intention of disbanding their relationship upon the attainment of a single, discrete goal.

Aside from the letter agreements, there is further evidence of an association-in-fact between Associates and Moss Creek. Invoices for work performed on the Prospects were not sent to Associates, but rather to Blue Diamond in Cut Bank, Montana. A new invoice was generated by Blue Diamond's accounting department in Montana and mailed to Associates in Louisiana. Additionally, both Associates and Moss Creek took active roles in the day-to-day operations of the Prospects. Although there were disagreements between Richard Decker and Bill Froman, a principal of Moss Creek, these differences were no ob-

stacle to the defendants' plans to promote additional prospects in the same manner.[8]

Additionally, the existence of the enterprise in this case was separate and apart from the pattern of racketeering activity in which it engaged. Here, the enterprise is not the pattern of racketeering activity proven by the plaintiffs. The enterprise, rather, is the entity created between Associates and Moss Creek for the common purpose of engaging in the promoting, prospecting and selling of oil. The pattern of racketeering activity, on the other hand, is the acts committed by the participants in the enterprise, i.e., Associates, Moss Creek, Richard Decker and Rena Decker. The two are distinct; the enterprise existed separate and apart from the predicate acts.

■ The next issue before the court is whether plaintiffs have established a pattern of racketeering activity. 18 U.S.C. § 1961(5) states that a pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity." Here, there can be no doubt but that the acts relied upon by plaintiffs to constitute the "pattern" occurred after October 15, 1970. Additionally, it is clear that these acts occurred within ten years of each other. "Racketeering activity" is defined to include any act which is indictable under 18 U.S.C. §§ 1341 (mail fraud) or 1343 (wire fraud). 18 U.S.C. § 1961(1)(B). Similarly, "racketeering activity" includes any offense involving fraud in the sale of securities. 18 U.S.C. § 1961(1)(D).

■ The activities engaged in by Associates, Richard Decker and Rena Decker constituted securities fraud in violation of Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. Rule 10b–5 provides:

*Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1353 (5th Cir.1985) ("The nexus with interstate commerce required by RICO is 'minimal'.")

---

**8.** There is no doubt that the activities of this enterprise affected interstate commerce. Most of the business of Associates and Moss Creek was conducted across state lines. *See, R.A.G.S.*

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities' exchange,

    (a) to employ any device, scheme, or artifice to defraud,

    (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

    (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Thus, in order to state a claim for relief under Rule 10b–5, the plaintiff must establish (1) a misrepresentation or omission or other fraudulent device; (2) a purchase or sale of securities in connection with the fraudulent device; (3) scienter by the defendants in making the misrepresentation or omission; (4) materiality of the misrepresentation or omission; (5) justifiable reliance on the fraudulent device by plaintiffs (or due diligence against it); and (6) damages resulting from the fraudulent device. *Warren v. Reserve Fund, Inc.,* 728 F.2d 741, 744 (5th Cir.1984).

It is clear, and the defendants do not dispute, that plaintiffs purchased "securities" within the meaning of the rule. The dispute in this case involves the existence of the misrepresentations or omissions, their materiality and whether scienter and justifiable reliance are present.

■ The court finds that the defendants made numerous material misrepresentations or omissions with respect to the Mast–A and Mast–B Prospects. The evidence shows that Richard Decker, who had extensive oil and gas experience, personally decided what information should be contained in the Mast–A and Mast–B circulars. He personally drafted the sections entitled "Conclusions" which state that each prospect was an "extremely low-risk venture".

As mentioned *supra,* no information or history of Associates or Moss Creek was included. Mr. Decker admitted that a reader of the circulars would have no idea who he or she would be dealing with. He also admitted that the 25% carried working interest which would benefit Associates and Moss Creek was not disclosed. Likewise, the circulars did not disclose that he, his wife and others would receive commissions, professional fees and expenses. He also conceded that the cash profit the parties anticipated receiving on each prospect was "completely hidden". Moreover, the circulars did not disclose that Richard Decker personally prepared the geological information contained in the circulars. Also, no production history on the wells that were listed in the circulars as comparable wells was given.

Available information filed by Moss Creek with the Texas Railroad Commission indicated the poor investment potential of the Mast–A and Mast–B Prospects. Mr. Decker admitted that this information was available and had probably been reviewed by him. Nevertheless, he chose not to include this information in the circulars. Although he was the author of the phrase "extremely low-risk", Mr. Decker admitted that no investment in oil and gas could be classified as "low-risk". He testified that it would always be improper to classify any oil and gas investment as an "extremely low-risk venture".

John Luttig, an expert in petroleum engineering and reservoir analysis, testified without rebuttal that the circulars at issue in this case were "unprofessional and incomplete". According to Luttig, the circulars contained no backup data, but only assumptions. He testified that there was no basis for Mr. Decker's estimation of geological success. Indeed, the information he reviewed indicated that very little oil had been produced in this area on a per well or per acre basis. Additionally, he stated that the available data showed that the payout period on the Mast–A and Mast–B Prospects was considerably longer than the ten or eleven month payout stated in the circulars. He testified that a two-

year payout is considered normal or "very good".

Luttig's opinion with respect to the Mast–A and Mast–B circulars was substantiated upon examination of outside data. According to Luttig, the State of Texas had no record of production for these wells. He testified that he would have thought the area to be a dry hole. Indeed, according to Luttig, the reputation of the Queen City Reservoir among persons in the oil community is not favorable. According to his testimony, a geologist would conclude that the area had insufficient merit on which to spend time or money.

Luttig also pointed out that the Mast–A and Mast–B circulars identified the spacing for the wells at five acres. The rules applicable to this area, however, set spacing at every half acre. According to Luttig, half-acre spacing would be required or expected because of insufficient energy in the ground to drive the oil to the surface.

Mr. Luttig also testified that the cost of drilling the wells in the Mast–A and Mast–B Prospects should have been two-thirds of that which was represented. This deficiency, along with the many others outlined *supra,* was information Luttig believed an investor would need to know. Finally, Luttig testified that he was also suspicious of the Prospects when he realized that the three circulars he reviewed were identical. The maps included in each were post-dated and contained no legends. None of the other materials included were dated. In his opinion, the circulars exhibited little professionalism and indicated only an attempt to persuade a reader that "everything would be okay".[9]

■ In *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court adopted the definition of materiality set forth in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (involving an action arising under Section 14(a), as amended, of the 1934 Act) for actions arising under Section 10(b) and Rule 10b–5. 108 S.Ct. at 983, 988. Under this definition, an omitted fact is material "if there is a substantial likelihood that a reasonable shareholder will consider it important in deciding how to vote". *Id.* at 983. To fulfill this materiality requirement, there must be a substantial likelihood that disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly "altered the total mix" of information made available. *Id.* The determination requires an assessment of the inferences a reasonable investor would draw from a given set of facts and the significance of those inferences to him. *Id.* at 988.

The court concludes that there is a substantial likelihood that a reasonable investor would have considered the inaccurate and missing information important in deciding whether to invest funds in the ventures. It cannot seriously be stated that disclosure of the omitted facts would not have been viewed by a reasonable investor as significantly altering the total mix of available information. Plaintiffs clearly proved the materiality of the misstated and omitted facts.

■ The defendants vigorously argue that plaintiffs have failed to prove that the misrepresentations and omissions of material facts were made with scienter. In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that the scienter requirement means that the defendant must have "a mental state embracing intent to deceive, manipulate or defraud". *Id.* at 193, n. 12, 96 S.Ct. at 1381, n. 12. The Fifth Circuit has interpreted the scienter requirement to be satisfied by proof that the defendants acted with "severe recklessness". *Warren, supra,* at 745. According to the Fifth Circuit,

Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely sim-

---

**9.** In sum, Mr. Luttig testified that the Mast–A and Mast–B Prospects could not be considered low-risk investments. According to Mr. Luttig, a layman would not have the capacity to ferret out truth from fiction from the face of the documents. He believed that the Mast–A and Mast–B circulars, on their face, were very misleading.

ple or even inexcusable negligence, but *an extreme departure from the standards of ordinary care*, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* (Emphasis in original.) An analysis of the scienter requirement necessarily involves an examination of the defendants' conduct. *Id.*

Plaintiffs have shown the severe recklessness of the defendants by clear and convincing evidence. The defendants actively sought out investors for what was obviously a depleted oil field. The investors, including plaintiffs, were shown either a Mast–A or Mast–B circular containing a plethora of material misrepresentations and omissions. The defendants knew that plaintiffs had no knowledge or experience with oil and gas investments. Nevertheless, they orally and through written representations made in the circulars touted the prospects as short-term, low-risk investments. They elicited the assistance of Normand Roy in getting other investors. Both Richard Decker and Rena Decker were aware that Roy had no experience in oil and gas investments. In sum, the defendants' misrepresentations and omissions presented a clear and obvious danger for misleading plaintiffs and other investors. The sum of the evidence presented indicates that this danger was either known by the defendants or was so obvious that defendants must have been aware of it.

The defendants argue strenuously that if they had intended to deceive and defraud plaintiffs, they necessarily would have made money. The defendants argue that plaintiffs presented no evidence whatsoever to establish that the defendants made any money on the Mast–B Prospect. Apparently, the defendants would have this court overlook the commissions and fees paid to the defendants on the Mast–B Prospect. Plaintiffs' Exhibit 118 reflects in-

come to the defendants from the Mast–B Prospect as of July 1, 1984, of $15,732.60. Of this sum, $732.60 was paid to Rena Decker as commissions; $6,000.00 was paid to Associates for log analyses and an elevation study for structural mapping; $5,000.00 was paid to Richard Decker as a geological fee; and $4,000.00 was paid to Associates.[10]

Plaintiffs have likewise satisfied the court of their reliance on the misrepresentations and omissions in causing their injuries. Although positive proof of reliance is not required in cases involving failure to make disclosure of material facts, *Basic Inc., supra,* 108 S.Ct. at 989, there is ample proof of reliance in the record. As mentioned, each plaintiff invested $9,157.50 in the Mast–B Prospect. No plaintiff has realized any return or otherwise received any money from his investment. All three plaintiffs testified convincingly that had they known of the misrepresentations and omissions discussed *supra,* they would not have invested in the Prospect.

The defendants make much of the fact that George took the precaution of having a friend, Donnie Jackson, look over the Prospect before deciding to invest. George, however, testified that the only purpose of having Jackson visit the field was to reassure himself that the "workings of an oil field were there." Like the other plaintiffs, George testified that had he known of the misrepresentations and omissions, he would not have invested. The nature of the misrepresentations and omissions bears this testimony out.

In sum, plaintiffs have shown at least three specific acts of securities fraud involved in their purchases of the oil and gas interests offered by the defendants. Richard Decker and Rena Decker, individually and as officers and directors of Associates,[11] employed the same *modus operandi*

---

10. In any event, the court rejects the proposition that the defendants could not have intended to deceive since they made no "profit" on the deals.

11. The court finds that Mr. Decker exercised sufficient control over the actions of Associates to justify the imposition of joint and several liability as to plaintiffs' claims under Rule 10b–5. 15 U.S.C. § 78t(a). As an officer and di-

for the Mast–B Prospect that was used for the Mast–A Prospect. More of the same was planned for the Mast–C and Mast–D Prospects. The nature of the omissions and misrepresentations show that the defendants were aware that the information conveyed to investors, orally and in the circulars, was misleading and false.

■■■■ Aside from securities fraud, plaintiffs proved that Richard Decker engaged in mail fraud in violation of 18 U.S.C. § 1341. Unlike Rule 10b–5, materiality and reliance are not elements of wire fraud or mail fraud. *Abell v. Potomac Insurance Company*, 858 F.2d 1104, 1129 (5th Cir.1988). Rather, plaintiffs need prove only a defendant's fraudulent intent; the success of a fraudulent scheme is not necessary to establish mail fraud or wire fraud. *Id.* To prove mail fraud, a plaintiff must prove that: (1) the defendant participated in some scheme or artifice to defraud; (2) the defendant or someone associated with the scheme used the mails or caused the mails to be used; and (3) the use of the mails was for the purpose of executing the scheme. *Id.* A scheme to defraud is one in which artifice or deceit is employed to obtain something of value. *Id.* at 1130. The necessary intent to defraud can be shown by proving that the defendants' plan was reasonably calculated to deceive persons of ordinary prudence and comprehension. *Id.*

■■■■ Under RICO, each use of the mails to accomplish the same scheme is a separate predicate act. *Id.* The evidence shows that after having devised a scheme to obtain money by false representations and omissions, Richard Decker placed numerous mailings in authorized United States Postal Service depositories. Specifically, Richard Decker placed in the mail or caused to be placed in the mail, for delivery

across state lines, the following documents: (1) numerous copies of the Mast–A circular; (2) numerous copies of the Mast–B circular; (3) a letter dated October 11, 1983, from Richard Decker to Normand Roy discussing the Mast–A and Mast–B Prospects; (4) a letter agreement between Associates and George with respect to George's investment in the Mast–B Prospect; and (5) a letter dated January 27, 1984, from Richard Decker to working interest holders in the Nacogdoches venture. Additionally, the defendants admitted their awareness and use of the mails for the submission of invoices to Cut Bank, Montana, for reprocessing and remailing to Shreveport.

■■■■ After plaintiffs began making inquiries as to the status of the drilling in the Mast–B Prospect, they began receiving monthly reports from Moss Creek. These periodic reports were mailed to plaintiffs from Nacogdoches, Texas. One such letter, dated, September 25, 1984, states: "If the lack of production on your wells is disheartening, as I am sure it is, please remember that we are hoping for more too. Also, keep in mind that if you don't make any money in this project, neither do we." This letter/report, like the other letters received by the plaintiffs, was signed by Tim Rabine, controller for Moss Creek. That the defendants did not personally mail these reports is of no moment. Under RICO, the defendants need not personally commit the predicate acts provided that the evidence is sufficient to connect them to the fraudulent scheme. *Casperone v. Landmark Oil and Gas Corp.*, 819 F.2d 112, 115 (5th Cir.1987).

The court also notes that the sending of letters by Associates, Richard Decker and Moss Creek following the incredibly poor performance on the wells in question was designed to lull the investors into a false

rector of Associates, Mr. Decker participated in the day-to-day management of Associates and was a major participant in the investment schemes. Without question, he had the requisite power directly or indirectly to influence corporate policy. Moreover, Mr. Decker failed to satisfy the court of his good faith or lack of knowledge with respect to the acts of fraud. Finally, Mr. Decker acted recklessly in inducing

the acts constituting securities fraud. *See, generally, G.A. Thompson & Company, Inc. v. Partridge,* 636 F.2d 945, 957–960 (5th Cir.1981). The court finds the evidence insufficient to justify imposition of controlling person liability on Mrs. Decker. There was no evidence that she either directed the day-to-day activities of Associates or had the power to influence corporate policy.

sense of security about their investments. These letters, which had the result of postponing inquiry by the investors and making the transactions seem less suspicious, each constitute themselves a violation of 18 U.S.C. § 1341. *United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986). In sum, the mailings in question served the defendants' purpose of furthering their scheme to defraud investors.

■ Additionally, Richard Decker engaged in wire fraud by making telephone calls in furtherance of the scheme. The elements of wire fraud, 18 U.S.C. § 1343, are identical to those for mail fraud, except use of the wires rather than of the mails must be shown. *United States v. Andrade,* 788 F.2d 521, 527 (8th Cir.), *cert. denied,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986). Here, Decker talked with George numerous times on the telephone. During these conversations, Decker assured George that the Prospect was doing well. Like the letters, these statements were made for the purpose of executing the defendants' scheme.

In *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1352 (5th Cir.1985), the Fifth Circuit held that two acts of mail fraud that related to a single business transaction constituted a pattern of racketeering activity. Later panels have questioned whether the occurrence of two or more instances of mail or wire fraud in connection with the same discrete offense is sufficient to form a pattern of racketeering activity under 18 U.S.C. § 1961(5). *Delta Truck & Tractor, Inc., supra,* at 243, n. 3. More recently in *H.J. Inc. v. Northwestern Bell Telephone Company,* —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) the Supreme Court further defined the "pattern" element. According to the Court:

> Congress had a more mature and common sense approach to RICO's pattern element in mind, intending a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it

might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity. *Id.* at —— —— ——, 109 S.Ct. at 2899. The court found that RICO's legislative history reveals a Congressional intent to require a RICO plaintiff to prove (1) the racketeering predicates are related and (2) the acts amount to or pose a threat of continued criminal activity. *Id.*

Without question, the predicate acts proven by the plaintiffs are related. The predicate acts committed by the defendants were in pursuit of the same overarching scheme to defraud investors in the Mast–A and Mast–B Prospects. The scheme could not have persisted without the commission of their acts. The defendants followed the same *modus operandi* in each venture, using the same supporting documents. Each venture had as its goal the fraudulent acquisition of investors' money.

Similarly, plaintiffs have proved the necessary element of continuity, i.e., the threat of additional predicate acts. After using identical procedures to defraud investors in the Mast–A and Mast–B Prospects, the defendants contemplated and began work on additional prospects. The predicate acts committed by the defendants extended over a period of years and threatened to continue into the future.

Having established violations of both RICO and Rule 10b–5, the only issue remaining is that of damages. As mentioned, RICO's civil remedies provision, 18 U.S.C. § 1964(c), permits each plaintiff to recover treble damages, costs and reasonable attorney's fees. Each plaintiff suffered a total loss on his investment, and, therefore, was damaged to that extent. Each plaintiff is entitled to recover $27,-472.50 plus costs and reasonable attorney's fees. With respect to plaintiffs' claims under Rule 10b–5, the court declines to award prejudgment interest on the amount of their investments. See, generally, *Huddleston v. Herman & MacLean,* 640 F.2d 534, 560 (5th Cir.1981), *aff'd in part and rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), *on*

**552**

*remand,* 705 F.2d 775 (5th Cir.1983).[12]

The parties are encouraged to stipulate regarding the amount of reasonable attorney's fees while, of course, reserving the right to contest the award on appeal. If a stipulation cannot be reached, the issue of attorney's fees will be handled in this court's regular motion practice. Counsel for plaintiff is instructed to submit a judgment, within ten (10) days of today's date, that has been approved as to form and content by counsel for the defendants.

---

**12.** Because plaintiffs' recovery under RICO and Rule 10b–5 is as broad or broader than that permitted under Sections 12(1) and 12(2), the court finds it unnecessary to address those claims.